**CRAWFORD PACKING COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 2773.**

United States District Court
S. D. Texas,
Galveston Division.

June 29, 1962.

Joseph Lyman, Washington, D. C., Eli Mayfield, Palacios, Tex., for plaintiff.

Robert Littenberg, Asst. Atty. Gen., Washington, D. C., for defendant.

NOEL, District Judge.

### Issue Involved

The issue is whether the fishermen, comprised of captains and deckhands, who performed fishing services on the plaintiff's boats were employees of the plaintiff under Sections 3121(d) and 3306 (i), Internal Revenue Code, Title 26 U.S. C.A. §§ 3121(d) and 3306(i), or independent contractors.

### General Statement

The above entitled civil action having come on for trial before the Court sitting without a jury, and due consideration having been given to the pleadings, stipulations of fact, exhibits, testimony and briefs on file, the Court enters the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact

1. This is an action under the Internal Revenue laws of the United States for recovery of taxes paid pursuant to the Federal Insurance Contributions Act, 26 U.S.C.A. § 3101 et seq., and the Federal Unemployment Tax Act, 26 U.S.C.A. §

3301 et seq., for the period commencing with the quarter ending March 31, 1957 through the quarter ending March 31, 1960.

2. The plaintiff is a corporation organized under the laws of the State of Texas, and did business in the State of Texas and in interstate commerce during said period.

3. During said period, plaintiff was engaged in the wholesale seafood business. The activities of plaintiff's business embraced (a) fishing for shrimp; (b) the ownership of boats for fishing shrimp; (c) the ownership and operation of a boat harbor, boat yard and machine shop; (d) the manufacture of ice; (e) the sale of ice and fuel to and servicing of boats owned by others, particularly those which delivered shrimp to plaintiff's dock; (f) the purchase of shrimp from boats other than boats owned by plaintiff; (g) processing shrimp; (h) packing shrimp; and, (i) selling the processed and packaged shrimp at wholesale.

4. In its business activities other than the ownership of shrimp boats and fishing shrimp, plaintiff employed approximately twenty-five persons. They were paid regular wages and worked fixed hours under the supervision and direction of plaintiff's supervisory personnel. The character of the relationship between plaintiff and these persons is not at issue here.

5. The said shrimp boats consisted of eight (8) diesel trawlers weighing between fifteen (15) and forty (40) tons each, which cost from $25,000 to $40,000 each. These boats were specially equipped, owned and operated solely for shrimp fishing, although fish other than shrimp (such as flounder) were caught incidental to fishing for shrimp.

5a. Prior to acquiring the said trawlers, plaintiff purchased all, or substantially all of the shrimp handled in its business in the open market from boats owned and operated by others. After acquiring said trawlers and for the period here under consideration, plaintiff obtained twenty to thirty per cent of the shrimp handled by it through the operation of said trawlers as described in these findings; the other seventy to eighty per cent of the shrimp handled by plaintiff during said period were purchased in the open market from boats owned and operated by others.

6. After the plaintiff had equipped a boat for fishing shrimp, from the fishermen in the community making application therefor plaintiff would select an experienced fisherman to whom the boat would be turned over for the purpose of fishing shrimp in the Gulf of Mexico, off the Coast of Texas. It was understood that the fisherman to whom a boat was let would be its captain and he was so recognized by plaintiff. Any individual so selected was one in whose honesty and integrity plaintiff had confidence and in whom the plaintiff had confidence as to his ability (a) to select a crew (that is deckhands); (b) to operate the boat; (c) to conduct fishing operations; and, (d) to supervise and get along with the deckhands.

7. The arrangement between plaintiff and each captain was entirely oral. The term of the arrangement was not specified or limited. It could be terminated by either party, voluntarily or involuntarily, although in practice this occurred only at times when a boat was in port. While the arrangement could be terminated, custom and practice was for it to be continued over an extended period of time for each boat and for more than one trip. While not formalized by the parties and designated as such, the arrangement constituted an oral contract pursuant to which the captains used the boats belonging to plaintiff on the terms and conditions and pursuant to the policies outlined in these Findings of Fact.

8. After an individual was selected as captain, the arrangement between plaintiff and the captain concluded and the boat was turned over to him by plaintiff, the captain would take the boat identification papers to the Bureau of Customs and would register with said bureau as captain of the boat as required by Federal law.

9. A. Each captain determined the qualifications of and selected his deckhands (that is his crew, consisting usually of two besides himself), determined the hours and working conditions of the crew and determined how and how much they were to be paid. Each captain had full charge of his crew and determined (a) when to depart on a fishing trip; (b) when to return; (c) where to fish (that is which fishing ground to work); (d) when to fish; (e) how to fish (that is the actual, mechanical process of operating the fishing nets and gear); and, (f) all other matters concerning the operation, maintenance and fishing of the boat from the time of departure from plaintiff's dock until return of the boat from a particular trip. The foregoing were the exclusive prerogatives of the captain. The deckhands took their orders from the captain, exclusively.

B. Plaintiff had certain general policies which were known to the captain and crews and which were a part of the arrangement between plaintiff and each captain; for example, intoxicating liquors were not to be taken on board the boats, the boats were to be fished only off the Coast of Texas and each catch of shrimp was to be taken to the nearest port and sold at the highest price obtainable.

C. Plaintiff had no right to and did not instruct the crews as to their work or how or in what manner to accomplish it.

D. The captain was responsible for making minor repairs to nets and fishing gear of the boat and for keeping the boat cleaned, oiled, greased while in port as well as while on trips. While in port, the latter responsibilities had to be discharged by the captain either with deckhands with whom he had an existing arrangement, or with other help provided by him. Neither the captains nor their helpers were paid for their work performed in port except as such payment came out of sharing in shrimp caught from the boat.

10. A. Under the arrangement between plaintiff and each captain, the latter used, worked or fished his boat on the lay or share basis consistent with the long standing custom in the fishing industry, obtaining at least since the time of Christ. During the earlier portion of the period involved here, the catch of shrimp from each trip was divided equally between the plaintiff and the captain, but during the latter portion of said period, each catch was divided 60 per cent to plaintiff and 40 per cent to the captain.

B. Plaintiff did not share in fish caught or objects dredged from the water incidental to shrimp fishing. All such fish (such for example as flounder) and objects went to the captain.

C. In addition to his share of the catch, plaintiff agreed to pay each captain two cents per pound for heading the shrimp. Heading was a necessary step in processing the shrimp for packing and ultimate sale, and could be done either by the captain before unloading the catch, or by others after unloading the catch; but, if done before unloading, it served two purposes beneficial to both parties, to-wit:

(1) it would reduce the weight of the shrimp and thereby permit a larger catch to be brought in; and,

(2) it would help prevent the shrimp from spoiling, thus permitting a longer trip and insuring a fresher product.

The captain was assisted in the heading by his deckhands, but it was optional with the captain as to whether or not the shrimp would be headed before sale.

D. Plaintiff had no direct relationship with the deckhands or crew. The captain selected them, worked them and paid them, the latter being on a sharing basis which he negotiated with them. Plaintiff did not know who the deckhands would be at the time the arrangement was made with the captain to fish a boat and, in fact, the deckhands frequently changed from trip to trip. The plaintiff learned the names of the deckhands for each particular trip at the time

of the settlement, in order to compute for the captain and deckhands their respective participation in the captain's share.

11. Various expenses were incurred in connection with each fishing trip. The crew paid for their own groceries, one-half of the cost of the ice and provided their own wearing apparel, which was in keeping with a long standing custom in the fishing industry. All other trip expenses were paid by the plaintiff.

12. After each trip a settlement was made wherein the plaintiff would provide the captain with a settlement sheet which indicated the gross amount of the proceeds from the sale of the shrimp whether sold to plaintiff or another. Any amounts charged by the crew for groceries and other personal items, as well as one-half of the cost of the ice, were shown as a deduction from the crew's share. The settlement sheet further disclosed the division of the captain's share between him and the crew (that is between the captain and his deckhands) in such amounts as agreed.

13. The captain decided how much fuel, ice and groceries to take aboard. When the boat was tied up at Palacios, Texas, the fuel and ice were obtained from the plaintiff's fuel and ice storage facilities. The captain had the right to purchase his groceries at any store of his own selection but they were usually purchased from one of several stores where the plaintiff had established credit. The captain decided what groceries to buy and purchased the groceries. He sometimes paid cash but usually would charge them to the captain or crew in the name of the boat and the bill therefor would be sent to the plaintiff. At the time of settlement the amount charged against the boat and paid for by the plaintiff for the groceries was deducted from the captain's share of the proceeds from the sale of the shrimp, along with one-half of the cost of the ice.

14. Each trip was considered a separate transaction for purposes of settlement. The payment to the crew for each trip depended entirely upon the proceeds of the catch. The length of any given trip depended on various factors, such as the capacity of the boat, the fuel and ice supply, the weather, and the general shrimping conditions but would ordinarily extend from three to ten days.

15. There was no guarantee of any kind of compensation to the captain, regardless of the time or effort expended, for attempting to catch shrimp. He was paid only for shrimp caught, plus incidental payments for other fish and heading shrimp. If a particular trip was unsuccessful, known in the shrimping trade as a broker, and the value of a captain's portion of the catch was insufficient to cover the captain's portion of the expenses of the trip, the captain's portion of the expenses would be carried over to succeeding trips to be deducted from the captain's share of the subsequent catches. The unpaid expenses were regarded as a personal obligation of the captain.

16. On occasion the plaintiff would make an advance of money to a captain out of its general funds with the understanding that it was a loan to be repaid. These loans were usually repaid out of the captain's share from future catches. Advances to deckhands by the plaintiff were made with the permission of the boat captain who was personally charged with its repayment. The captain in turn would charge the amount against the deckhand's share, which share had been agreed upon separately between the captain and his deckhands.

17. There was no express agreement specifying the extent to which plaintiff had control over the fishing activities of the captain. It is clear that in fact no actual control was exercised over the details, manner or methods employed by the captain and his crew.

18. The plaintiff's boats were not equipped with ship-to-shore telephones. They were equipped with radios which permitted contact with the boats only through the marine operator in Galveston, Texas. Such contact between the plaintiff and the boats was not frequent. The radio was used only for contact in

case of emergencies, to ascertain weather conditions and the location of shrimp.

19. Each time and at the time a boat returned to port, the trip was over and the work of fishing on that trip was concluded. The captain was then in possession of the catch, which was owned by him (including his crew) and plaintiff in the agreed proportions.

20. Shrimp, being very perishable, it was in the interest of each party to make an immediate disposition of the catch upon reaching port.

21. When a captain brought his boat into port at Palacios, Texas with a catch although the captain was not required to sell his share of the catch to plaintiff, the plaintiff expected that the entire catch would be unloaded at his dock. While plaintiff did not pay any captain a salary and did not guarantee any captain a profit from his fishing, plaintiff did guarantee each captain a market for his part of the catch (if there were a catch) at the prevailing market price when brought to Palacios, Texas. Each captain was thus assured that his part of the shrimp caught and brought to Palacios, Texas would not be lost by spoilage.

22. It was the practice in the early part of the period for the boats to return to Palacios, Texas and unload the catches at plaintiff's docks. Later in the period and at the instance of the captains, plaintiff made credit arrangements with fish purchasing houses at Aransas Pass and Freeport, Texas to purchase catches and service plaintiff's boats with fuel, ice and groceries. The costs of such service would be initially charged to the plaintiff but at the time of settlement would be allocated as between plaintiff and the captains in the manner above found for making settlements.

23. On occasion, a captain would bring the vessel into another port than Palacios, Freeport or Aransas Pass, Texas. It was a part of the understanding between plaintiff and the captains that before any disposition was made of the shrimp the captain would call plaintiff and advise where the vessel had been docked and what disposition of the shrimp was desired. Prior to making such call the captain would investigate the price around the harbor. Upon a confirmation of that from the captain and verification by the owner of the fish house, if satisfied with the price, plaintiff would authorize unloading the shrimp. The buyer of the shrimp would send the plaintiff a check for the proceeds of the sale.

24. The livelihood of a captain depended solely upon his initiative and skill as a fisherman coupled with the probables of weather and the run of the shrimp. He may have exerted his efforts for long or short periods of time and have no claim to earnings or compensation of any kind, while, on the other hand, he may have been well rewarded by a share of large catch made in a short space of time.

25. The plaintiff would usually have no written record of the identity of the crewmen on the vessels until the time of settlement. However, as a practical matter all of the captains and most of the deckhands were known to the fleet manager of the plaintiff. At the time of settlement plaintiff required the names of such crew members for the purpose of listing them on the corporation's records for State Unemployment Insurance, Workmen's Compensation and Federal Withholding and Social Security Tax purposes as required by the State of Texas and the Internal Revenue Service.

26. Certain documentary evidence was admitted as admission against interest by both plaintiff and defendant. Such admissions have been considered along with all other facts and given appropriate weight in reaching a decision as to the status of these fishermen.

27. The plaintiff did have the right to control the results of the captain's work and interfered in the process to some degree to assure a proper result from the undertaking.

28. The plaintiff had no agreement with the captain which entitled it to a preferred call on all the time and services of the captain.

554

29. The plaintiff had no actual control over the crewmen nor did it exercise any control over their activities through the captain.

30. The plaintiff filed proper employment tax returns with the Internal Revenue Service during the period here in issue and paid employment taxes on the earnings of the captains and crewmen.

31. Plaintiff filed a claim for refund of its portion of the Federal Insurance Contributions Taxes and the Unemployment Taxes paid on the earnings of the captains and crewmen. The claim was disallowed by the Commissioner of Internal Revenue and this action, which followed, was timely filed.

32. The Court finds no substantial evidence of any effort on part of the plaintiff to control the captain and crew members to such an extent that their status would be one of employee rather than one of independent contractor.

33. Finally, the Court finds that the degree of control exercised by the plaintiff in the marketing of the product which was jointly owned with the fishermen was not such as to remove the relationship from that of independent contractor to that of employee.

### Conclusions of Law

1. This Court has jurisdiction of the parties and this action pursuant to the provisions of Title 28 § 1340, U.S.C.A.

2. The captains and crewmen (deckhands) in question were not the employees of the plaintiff within the meaning of Title 26, §§ 3121(d) and 3306(i), United States Code, §§ 3121(d) and 3306 (i), Internal Revenue Code, 1954, and Regulations §§ 31.3121(d)1–(c), and §§ 31.3306(i)–1.

3. The essential facts of this case are not different from those considered by the United States District Court for the Southern District of Mississippi in the case of Williams Packing & Navigation Co., Inc. v. Enochs, District Director of Internal Revenue, July 3, 1959, opinion reported 176 F.Supp. 168 and affirmed, 291 F.2d 402 (C.A.5th, 1961), certiorari granted, December 11, 1961, 368 U.S. 937, 82 S.Ct. 379, 7 L.Ed.2d 336. The District Court there found that the shrimp fishermen were not employees under the Social Security Act, 42 U.S.C.A. § 301 et seq.

4. The plaintiff is entitled to a refund of Federal Insurance Contributions Taxes and Federal Unemployment Taxes claimed by reason of the erroneous payment and collection thereof in an amount to be computed by the defendant, together with interest and costs as may be allowed by law. If the amount is not agreed upon, same is to be settled on five days notice.

5. Judgment will be entered for the plaintiff.