David **STEVENS**, Plaintiff-Appellant,

v.

**SEACOAST COMPANY, Inc. and M/V ELENA S, Defendants-Appellees.**

No. 26852.

United States Court of Appeals
Fifth Circuit.

Aug. 13, 1969.

Samuel Richard Exnicios, New Orleans, La, Roland J. Mestayer, Jr., Pascagoula, Miss., for appellant.

John M. Sekul, Jules Schwan, Biloxi, Miss., for appellees.

Before JOHN R. BROWN, Chief Judge, GODBOLD, Circuit Judge, and CABOT, District Judge.

JOHN R. BROWN, Chief Judge:

The wrinkle, not a new one, cf. Mike Hooks, Inc. v. Pena, 5 Cir., 1963, 313 F.2d 696, 697, 1963 A.M.C. 355, that differentiates this case from the run-of-the-sea claim for a seaman's personal injuries is the contention which usually strands in fact and here founders on the reef of law that the master of the fishing vessel on a lay was the bare boat charterer or a sort of seagoing independent contractor carrying on a joint venture with fellow crew members, so that the seaman was his, not the Shipowner's, employee. The Trial Court sustained this defense. Because this result affords a too-easy insulation from serious and far-reaching obligations reflected both by the Congressional policy of the Jones' Act, 46 U.S.C.A. § 688, and perhaps even more so by the dynamic developments in the *Sieracki-Ryan-Yaka* era,[1] we reject it. We therefore reverse and remand to fix damages.

The cause of this nautical controversy is the injury to the seaman, a young up-country Mississippi boy who had never been to sea in his life. He was severely injured in the first half hour of his oyster dredging operations on the M/V Elena S. while she was running the oyster beds at Caliga Bay off the Gulf Coast.

The vessel was 58 feet in length with a beam of 18½ feet, fitted out for dredging oysters. It is uncontradicted that she was owned by Seacost Company, Inc., and was, as the Trial Judge's findings accurately characterized, "assigned to a master," a young man of 23 whose formal education ended at the sixth grade. There was no written contract of any kind between this young man and Shipowner. And from the young Master's testimony generally, it is quite evident that if he was, as Shipowner's proctor successfully urged, a bare boat charterer, a demise charterer, or a charterer *pro hac vice*, he did not know it, nor did he comprehend the legal significance of any such strange terminology or, worse, his obligations as a supposed employer of his fellow crew members. The vessel was worked on a lay under which, the Trial Court found, "at the end of each trip the catch was sold to the [Shipowner]". Although there was a suggestion that the Captain was free to dispose of the catch elsewhere, it is quite clear that this was limited to extraordinary situations and a Captain would not last long if he chose to sell the catch to one of Shipowner's numerous competitors in the area. For oyster dredging operations the proceeds of the catch were divided in this fashion. From the top, Shipowner was first paid a dredging hire (a stated amount per barrel) and then was reimbursed for all expenses incurred for fuel, ice, and —as so unfelicitously described in non-nautical language—groceries for the trip. After the dredge fee and trip expenses were skimmed, the remainder was divided into five equal shares, one for Shipowner and one for each of the four crew members, *i. e.*, the Captain and three seamen. Following the custom of the area, the Captain selected his own crew members and was presumably given full authority to hire and fire. Once the vessel got underway Shipowner could not, of course, have any control over her activities, and her control, navigation, and operation were committed to the Captain. This presumably included the manner in which the dragging for oysters was physically performed.

The Trial Judge, undertaking to distinguish this situation from that found by Judge Allred to be a shipowner-seaman relationship in Justillian v. Versaggi, S.D.Tex., 1954, 169 F.Supp. 71, not mentioning a host of other cases pre-

---

1. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, 1946 A.M.C. 698; Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, 1956 A.M.C. 9; Reed v. The Yaka, 1963, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448, 1963 A.M.C. 1373.

sumably because they were not cited by either counsel to him or for that matter to us on appeal,[2] and putting almost complete reliance on our opinion in Gulf Coast Shrimpers and Oystermans Ass'n v. United States, 5 Cir., 1956, 236 F.2d 658, held that the captain was a bare boat charterer of M/V Elena S., who, on accepted principles, see G. Gilmore & C. Black, The Law of Admiralty 218 (1957), bears the in personam liabilities for the vessel's operation and specifically those of the employer of the seamen making up the crew.

Of course, there are situations in which courts recognize that the question whether the relationship of employer-employee, shipowner-seaman exists, is one of fact to be resolved by the trier of fact. See note 2, *supra*. But in the light of overriding principles affording the utmost protection to seamen, Mitchell v. Trawler, Racer, Inc., 1960, 362 U. S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960 A.M.C. 1503, such situations are bound to be rare.

■ And certainly this record does not orbit to a factual apogee. To the contrary, on the most favorable review of the findings below and the contentions of Shipowner, this arrangement does not begin to approach the perigee of the minimum requirements of a demise charter. Indeed, the only thing which resembles a bare boat charter is

the barrenness of any indicia characteristic of an owner *pro hac vice*. At the outset, the so-called charterer—whether considered to be the Captain or collectively the Captain and his fellow shipmates—does not "man, victual",[3] and supply the vessel. This burden is shared by all, including Shipowner, since the division under the lay into five equal shares apportions the expenses, even though they may initially have been incurred or guaranteed by Shipowner. Next, the fact that the Captain alone hires and fires the crew is of no significance at all. For while gigantic shipping companies with their sprawling departmental hierarches including port captains, port engineers, hiring halls, union agreements, and the like, tend to obscure the shipmaster's role, the fact remains that under express law and tradition that spans the centuries, the engagement reflected by that most maritime of all maritime contracts—Shipping Articles—is not between shipowner and seaman, but between master and seaman.[4]

The same thing is true as to the operation, navigation, and control of the vessel once underway. Just how a remote owner could navigate a vessel from shore is not revealed. But not to be forgotten is that lowly as may be his station in the world of seafarers, homely as may be the little craft he cons, the Mas-

2. Osland v. Star Fish & Oyster Co., 5 Cir., 1941, 118 F.2d 772, 1941 A.M.C. 792, cert. denied, 314 U.S. 615, 62 S.Ct. 86, 86 L.Ed. 495; Osland v. Star Fish & Oyster Co., 5 Cir., 1939, 107 F.2d 113, 1940 A.M.C. 127; Southern Shell Fish Co. v. Plaisance, 5 Cir., 1952, 196 F.2d 312, 1952 A.M.C. 883; Hudgins v. Gregory, 4 Cir., 1955, 219 F.2d 255, 1955 A.M.C. 1012; Cape Shore Fish Co. v. United States, 1964, 330 F.2d 961, 165 Ct.Cl. 630, 1964 A.M.C. 2585.

3. *See, e. g.*, 46 U.S.C.A. § 186:
"The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this chapter relating to the limitation of the lia-

bility of the owners of vessels; and such vessel, when so chartered, shall be liable in the same manner as if navigated by the owner thereof."

4. *See, e. g.*, 46 U.S.C.A. § 564:
"The master of every vessel bound from a port in the United States to any foreign port * * * shall * * * make an agreement in writing * * * with every seaman * * * in the manner hereinafter mentioned; and every such agreement * * * shall be signed by the master before any seaman signs the same, and shall contain [the particulars specified]." See also 46 U.S.C.A. §§ 566–575.
Of course, written articles are not required for vessels in certain coastwise trade or those on a lay. 46 U.S.C.A. § 564.

ter is "lord of his little world",[5] and the one thing the law's Plimsoll Line demands is that no one—not even a Captain Nott[6]—can undertake swivel-chair navigation to tell a so-called Master to turn to, stay put, or seek a haven. *Cf.* Boudoin v. J. Ray McDermott & Co., 5 Cir., 1960, 281 F.2d 81, 1960 A.M.C. 1884.

At most, the only control not inherent in a shipmaster's work committed to the Captain under this arrangement was the selection for the moment of the place to dredge and the manner in which the dredges were put out, hauled in and the ship operated.

When there is added to all of this—or, more accurately, all of this nothing—the fact that there is no tenure or substantial duration in point of time to the arrangement between Shipowner and Master so that at the first moment the "independent" contractor displeases the shipowner the agreement can be revoked at will, it demonstrates that no real possessory rights are invested in the so-called charterer. But this is the essential requisite of a demise char-

ter to distinguish it from time and voyage charters and the like. G. Gilmore v. C. Black, The Law of Admiralty 215–219 (1957). Under an arrangement so loose it cannot be identified, a valuable vessel is turned over to one for physical operation without regard to relative financial stability, and at the same time all of the other burdens of shipowning, including expensive maintenance, repair, insurance, and the like, are borne solely by the owner. Worse, if it is really a demise charter, then the owner exposed his vessel to unlimited maritime liens, 46 U.S.C.A. § 971, since there was no § 973 limitation on the power of the charterer, § 972, to incur them. See Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 1940, 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197, 1940 A.M.C. 647; Tampa Ship Repair & Dry Dock Co. v. Esso Export Corp., 5 Cir., 1956, 237 F.2d 506, 1957 A.M.C. 102. It is simply an illusion to call this arrangement anything other than a means of determining fair compensation to those who take the ship to sea to fish or shrimp or dredge for oysters.[7]

---

5. See United Geophysical Co. v. Vela, 5 Cir., 1956, 231 F.2d 816, 819, 1956 A.M.C. 745:

   "But navigation in these circumstances is left neither to Judges nor the Elder Brethren of Trinity House nor those who, in the garb of experts, from the security of a swivel chair now lay out the course with great conviction. 'The master is the commander of the ship—lord of his little world. He is master in every sense of the word * * *'. The Balsa, 3 Cir., 10 F.2d 408, 409. Whether he has bridge or quarterdeck to stalk, as long as he commands,, he is master. It is the Master, then, who must make these decisions and who, clothed with great responsibility, enjoys the greatest and widest of good faith latitude in professional judgment. 'The fundamental principle in navigating a merchantman, whether in times of peace or war, is that the commanding officer must be left to exercise his own judgment. Safe navigation denies the proposition that the judgment and sound discretion of a captain of a vessel must be confined in a mental strait-jacket. * * *'

   The Lusitania, D.C.S.,D.N.Y., 251 F. 715, 728."

6. See Central R.R. v. Tug Marie J. Turecamo, E.D.N.Y., 1965, 238 F.Supp. 145, 148, 1965 A.M.C. 2570, quoting from the Mary T. Tracy, S.D.N.Y., 1920, 298 F. 528, 530:

   "The contrary view as testified by Capt. Nott called as an expert is but the old story of being able to tell, after the event, what should have been done, where the critics were not there, and were not confronted with the problem nor the emergency. There is always a Capt. Nott. Sometimes he sits by the cozy fireside, and sometimes he testifies in a courtroom. He recites how it could have been better managed, but, if the responsibility had been his, he would have been worried sick, and probably would not have done half as well."

7. See Southern Shell Fish Co. v. Plaisance, note 2, *supra:* The "shares or lay awarded the captain and crew were merely a method of paying them for their services according to results accomplished, rather than on a daily or weekly basis." 196 F.2d at 314. See also Hudgins v. Greg-

And no comfort can be drawn from the large collection of cases not cited but known to us concerning the status of crew members on fishing vessels for purposes of the Federal Insurance Contribution Act or the Federal Unemployment Tax Act. Analyzing the problem in the light of general maritime principles urged upon the Court by the Government, this Court in United States v. W. M. Webb Inc., 5 Cir., 1969, 402 F.2d 956, A.M.C. cert. granted, 394 U.S. 996, 89 S.Ct. 1591, 22 L.Ed.2d 774 had this to say concerning an arrangement which was substantially identical with that involved in the instant case:

"Does a realistic application of common law tests require the relationship of owners to the captains and crews be evaluated under principles of general maritime law? The ' "ancient solicitude of courts of admiralty for those who labor at sea" continues unchanged, despite the progress from canvas sails to diesel engines.' In non-text context when courts are asked to determine whether seamen are employees of the vessel's owner, all ambiguities or doubts are resolved in favor of the seaman. Today, the law is clear that in both categories of cases—Jones Act, and maintenance and cure—the owner of the vessel is the employer unless the vessel is held under a demise charter. The arrangements here certainly did not constitute demise charters. If we were free to apply maritime law as a test of the employer-employee relationship, we would reverse the decision of the district court. This is so because it is clear that under maritime law the captain is the agent of the owner (on the facts here) and the crew hands are employees."

402 F.2d at 959.

That the Court went on to hold that the relationship of employer-employee did not exist as to seamen for *tax purposes* merely highlighted the distinction between the general maritime and the common law rules. Of course, making distinctions is a regular part of the daily travail of a federal judge.[8] What makes the tax cases of no real significance here applies with double force to

ory, 4 Cir., 1955, 219 F.2d 255, 258, 1955 A.M.C. 1012.

For its contribution to the legend and lore of fishing lays, it is regrettable that the fascinating opinion of the Court of Claims in Cape Shore Fish Co. v. United States, 1964, 330 F.2d 961 (see especially 967–973, conceals its gifted author as a per curiam.) From Justice Story, Coffin v. Jenkins, C.C.D.Mass., 1844, 5 Fed. Cas. p. 1188 (No. 2948) to Moby Dick, the lay has been a means of measuring compensation for crew members—kages for which maritime remedies are available for collection 330 F.2d at 969 & nn. 13, 14.

8. Frequently, to effectuate the congressional will, there will be conflict and collision between two federal statutes or policies. This is articulated in Lincoln Mills v. Textile Workers, 5 Cir., 1955, 230 F.2d 81, 96, n. 17 (dissenting opinion):

"The same situation or circumstance frequently produces diverse results: c. g., direction and control of trucks, adequate to create genuine independent contractor relationship under Wage & Hour Law, 29 U.S.C.A. § 151 et seq., and Social Security Law, 42 U.S.C.A. §§ 1001 et seq.

1101 et seq., United States v. Silk (Harrison v. Greyvan Lines), 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757, is insufficient to make physical performance by owner-drivers of trucks 'transportation' under National Transportation Act, 49 U.S.C.A. § 301 et seq., United States v. N. E. Rosenblum Truck Lines, 315 U.S. 50, 62 S.Ct. 445, 86 L.Ed. 671, Thomson v. United States, 321 U.S. 19, 64 S.Ct. 392, 88 L.Ed. 513; a crew member of a non-selfpropelled dredge is a 'seaman' under the Jones Act, 46 U.S.C.A. § 688; McKie v. Diamond Marine Co., 5 Cir., 204 F.2d 132, but not a "seaman" under the Wage and Hour Act, 29 U.S.C.A. § 201 et seq.; Walling v. W. D. Haden Co., 5 Cir., 153 F.2d 196, certiorari denied 328 U.S. 866, 66 S.Ct. 1373, 90 L.Ed. 1636; Towing of barges physically performed by chartered tug is not 'transportation' by tug owner-operator under the Interstate Commerce Act, 49 U.S.C.A. §§ 901, 909(a), De Bardeleben Coal Corp. v. United States, D.C.W.D.Pa., 54 F.Supp. 643, affirming Union Barge Line Application, 250 I.C.C. 689, but is 'transportation' for transportation tax under 26 U.S.C. § 3475(a), Gulf Coast Towing Co. v. United States, 5 Cir., 196 F.2d 944."

criminal cases[9] such as Gulf Coast Shrimpers & Oystermen's Ass'n v. United States, 5 Cir., 1956, 236 F.2d 658.

Our subsequent discussion on the merits of the claim for damages bears out the strong congressional policies which assure day-by-day protection to seamen. The Jones Act itself is in sweeping terms.[10] Incorporating as it does the Federal Employers' Liability Act, the Jones Act protects seafaring workers against all manner of contracts and agreements which undertake to lessen or avoid the strict responsibilities imposed by Congress upon the employers of seamen.[11]

As reflected in the more detailed discussion on the substantive liability for damages, this case bears out the wisdom of that policy. Here, under a mistaken or hoped-for supposition that the outfitting of the vessel was to be left to the crew as it saw fit, the real owner of the vessel was either unaware of or indifferent to any obligation to supply adequate first aid equipment and medicines. Likewise, the obligation to furnish maintenance and cure was rejected altogether by Shipowner, and the Master, as the supposed employer, was unaware of his obligation or financially unable to respond to it. Similarly Shipowner, apparently feeling safe in its legalistic haven of a somehow demise charter, was unaware of or indifferent to its obligation to equip the vessel with rudimentary radio equipment. This effort to parcel out or palm off serious obligations to the immediate detriment of a seaman to whom all owed the highest duties demonstrates why arrangements, in order to be effective, have to be of the most exacting kind before they are permitted to shift the pervasive obligations of a normal, traditional shipowner onto the back of some other party.

Once the question of status of shipowner-seaman is reached as a matter of law, the rest of the case falls by reason of spectacular negligence for which Shipowner is responsible and for flagrant unseaworthiness which is its sole charge.

Only a brief description of the occurrence need be made. To outfit the vessel for dredging oysters, a vertical post with a cross bar forming a T is securely fastened into the keel at the forward end of the forward hold. Shackle blocks are fixed to each end of the cross T bar. A chain for each side runs forward from the capstan on each end of the winch, which is located just forward of the wheel house. The chains run from the capstan up through the block then downward and aft over the gunwale where it is made fast to the metal cage-like dragging structure, which is called the dredge. These are hauled in one at a

---

9. See Cape Shore Fish Co. v. United States, 1964, 330 F.2d 961, 971 & n. 17, 973, 165 Ct.Cl. 630.

10. "§ 688. Recovery for injury to or death of seaman

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. * * *". 46 U.S.C.A. § 688.

11. "§ 55. Contract, rule, regulation, or device exempting from liability; set-off

Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: Provided, That in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought." 45 U.S.C.A. § 55.

time. The injury occurred when the seaman either grabbed onto, or fell against, the chain as it was being hauled in.

On the seaman's story, he was instructed by the Captain to feel the chain to detect whether the dredge was likely filling up with oysters. On the Captain's story, he had thrice warned this very, very green hand not to get near or touch the chain. Another crew member had also warned him a fourth time. Nonetheless, the Captain, busy as he was with responsibility to be both at the wheel inside the pilot house and at the lever of the winch outside the pilot house—an impossible role for one man in one place to fill—saw that the seaman was leaning against the chain. He warned him to get away from the chain and then saw that the seaman turned his back both to the Captain and to the chain. According to the Captain, the seaman's footings somehow slipped, and as he fell back into the chain while it was being hauled in, the seaman instinctively grabbed at it. This caused his hand to to be pulled up into the block, damaging his hand and severing some of his finger joints.

■ On the Master's own story, it is uncontradicted that despite repeated warnings the seaman was still near the chain at the moment the Captain engaged the lever to haul in on the chain. At the moment he did that, the Captain saw that the seaman's back was to the Captain and to the chain. By the Master's own conduct and his repeated warnings of the hazards, it is clear that he, better than anyone else, knew of the dangers. Moreover, he knew that these were augmented by the physical position of the seaman with his back to the danger and to the operator of the winch. Under these circumstances, the responsibility for this resulting action must rest upon the Captain alone, whose act, of course, is chargeable to Shipowner. The seaman's youth, unfamiliarity, and total lack of experience put a heavier burden on the ship and relieved the victim of

responsibility. See Davis v. Parkhill-Goodloe Co., 5 Cir., 1962, 302 F.2d 489, 1962 A.M.C. 1720.

But fault does not end there. For the M/V Elena S. was unequipped with a radio. It is true that people undertook to testify that this was customary, but this is not enough. In this day when every teenager strolling the streets carries a radio of sorts, and farmers, ranchers, and sportsmen have civilian band communicating radios, and hundreds of pleasure vessels are equipped with two-way radios on standard mobile marine operator and Coast Guard channels, the law can draw on its own resources to find a need and thus to reject a custom as wanting in due care as this one. See Pure Oil Co. v. Snipes, 5 Cir., 1961, 293 F.2d 60, 71 & n.17 and cases cited therein, 1961 A.M.C. 1651; Salem v. United States Lines, 1962, 370 U.S. 31, 36 n.6, 82 S.Ct. 1119, 1123 n.6, 8 L.Ed.2d 313, 318 n.6; The T.J. Hooper, 2 Cir., 1932, 60 F.2d 737, 740, 1932 A.M.C. 1169 (lack of radio equipment established unseaworthiness); cf. Walker v. Harris, 5 Cir., 1964, 335 F.2d 185, 1964 A.M.C. 1759; cert denied, 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342.

■■ Here the glaring deficiency in the vessel's equipment and hence her unseaworthiness is of more than academic consequence. For on a story read most favorably to Shipowner, after the M/V Elena S went from one nearby vessel to another and finally to an offshore drilling rig, at least an hour and perhaps an hour and a half elapsed before they were able to communicate with the Coast Guard, which promptly sent a helicopter to pick up the injured seaman. Without any sedation whatsoever, he suffered substantial pain described by all as acute. Compensation must be, and is to be, allowed for delay in rendering prompt medical attention. See Bass v. Warren Fish Co., 5 Cir., 1957, 245 F.2d 43, 1958 A.M.C. 404.

■■ Bearing upon this is another glaring deficiencey in the ship's stores and hence her unseaworthiness. She

had a first aid kit of sorts. What sorts we do not know. The record is clear, however, that it did not contain any sedation stronger than aspirin. And even these were not administered. Indeed, in making out the best they could with what obviously was a humane purpose to help their injured fellow seaman, the other crewmen made tourniquets and bandages out of bed sheets off the bed of one of the crewmen. When time—which was passing by needlessly from the failure of the vessel to have rudimentary radio communication facilities—is filled with conscious pain that cannot be reduced or alleviated from want of sedations which a vessel ought, and is permitted to carry, the damage for this element becomes augmented and is traceable to unseaworthiness and negligence of Shipowner.

To cap it all off, when the man was sent ashore by helicopter the Captain gave him a couple of dollars. That's the last time he got any money from the Master (the supposed employer) or Shipowner (the real and legal employer). His counsel directed a letter demand for the payment of maintenance and cure, but this was ignored, or at least nothing was done. He was not even paid his share of the lay ($22.92). It was not until two years later in the Trial Court's decree that he got this plus maintenance and cure for approximately six months (totaling $1200). The failure to provide the necessary medical aid, care, and attention, which comprise the maritime obligation of maintenance and cure was another fault on the Shipowner's part. Murphy v. Light, 5 Cir., 1958, 257 F.2d 323, 1959 A.M.C. 625. Whether this contributed in any degree to additional pain or disability or prolonged the recovery period is a matter not reflected by this record. But, if this is established, it too is an element for which resulting damages are due. Cortes v. Baltimore Insular Line, 1932, 287 U.S. 367, 53 S.Ct. 173, 77 L. Ed. 368, 1933 A.M.C. 9; G. Gilmore & C. Black, The Law of Admiralty 269–70 (1957).

The case must therefore be reversed and remanded for further proceedings consistent with this opinion, including the allowance of damages as a result of Shipowner's negligence, the unseaworthiness of the vessel, and the undisputed failure to furnish maintenance and cure when needed.

Reversed and remanded.