Charles F., Michael L. and L. M. ANDERSON t/a Anderson Seafood Company, et al., Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.

No. 71–1332.

United States Court of Appeals, Fifth Circuit.

Oct. 27, 1971.

William H. Stafford, U. S. Atty., Clinton Ashmore, Asst. U. S. Atty., Tallahassee, Fla., Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, David E. Carmack, Attys., Fred B. Ugast, Acting Asst. Atty. Gen., Thomas L. Stapleton, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Julian Bennett, Panama City, Fla., Joseph J. Lyman, Washington, D. C., for plaintiffs-appellees.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GEWIN, Circuit Judge:

This is a tax refund case. Under federal law [1] an employer is responsible for the payment of a specified portion of social security and unemployment taxes on the earnings of his employees. In this case the district court granted taxpayers,[2] owners of commercial snapper fishing boats, a refund of such taxes which had been paid on behalf of the captains and crews who manned taxpayers' boats. While it is our opinion that the essential and critical findings of fact by the district court are supported by substantial evidence we reverse because we do not believe that the legal conclusions reached are supported by the facts found.

Taxpayers owned boats used in commercial fishing in the Gulf of Mexico. Oral contractual arrangements in accordance with long established customs of the industry were made with captains who were selected from applicants in the community. Each captain was furnished with an equipped vessel by the owner. The captains were to staff the boats with crewmen and to fish for snapper to be sold to the boat owners at an agreed price. In many cases the captains served on the same vessel for a substantial length of time, although the oral agreements permitted either the taxpayers or the captains to terminate the relationship at the end of any fishing trip. In addition, the taxpayers reserved the right to terminate relations with captains if their actions endangered personnel or destroyed property, if the catch was sold to others without the consent of the taxpayers, or if they failed to make a profitable catch of fish. The captains usually determined the duration of fishing trips which varied according to prevailing circumstances, but agreed to return the catches to the home port and docking facilities leased at the expense of taxpayers without a guarantee of any earnings if they failed to catch fish. Unless the taxpayers gave

---

1. Federal Insurance Contributions Act, 26 U.S.C.A. § 3101 et seq.; Federal Unemployment Tax Act, 26 U.S.C.A. § 3301 et seq.

In both of the cited statutes "employee" is defined to include "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee."

2. The taxpayers-appellees are: Charles F., Michael L. and L. M. Anderson t/a Anderson Seafood Company, et al.

their consent the catches were delivered only to them at a negotiated price per pound agreed upon prior to the commencement of the trip. The captains managed the details of the operation of the boats and the manner of fishing.

While the captains were free to establish their own standard of compensation, it was the general practice to fix the wage rates by agreement between the captain and the crew based upon the weight of their catch. The earnings of the captains depended entirely upon the total volume of the catches. At the conclusion of a fishing trip the captains delivered a tally sheet to the taxpayers who then performed certain bookkeeping services and computations and issued individual checks to the captains and the members of the crews. Income taxes were withheld by the taxpayers from such payments.

It was clearly understood that the boats were to be operated exclusively for the purpose of snapper fishing. In some circumstances, depending upon market conditions, the taxpayers would receive from the captains and the crews other types of fish at an agreed price. The amounts of fish, other than snapper, which the taxpayers were willing to receive were limited, and any excess was accepted with the understanding that it would be sold on consignment and whatever price was obtained would be divided between the taxpayers and the fishermen on a negotiated basis.

Boat repairs and maintenance costs were paid for by taxpayers,[3] who were also responsible for property damage to the vessel and for personal injuries to crewmen that resulted from defects in the vessels. Insurance premiums, if any, were paid by taxpayers. Expenses immediately incidental to each fishing trip such as the cost of food, ice, fuel, tackle and bait were borne by the captains and their crews. Supplies were usually purchased at places where the taxpayers maintained credit. At times money was advanced to the captains by the taxpayers against anticipated earnings. The boats were equipped with radios which were used to communicate with taxpayers in case of emergency, or when repairs were needed, and to give approximately 24 hours notice before returning to the home port at Panama City, Florida, designated by the taxpayers as the usual place of unloading the catch. The taxpayers reserved the right to control the results of the fishing venture and they interfered in the process to the degree necessary to assure a proper result.[4]

With the foregoing facts in mind we must determine whether taxpayers are entitled to the refund allowed by the district court. The answer to that question turns upon whether the taxpayers were employers of the captains and the crew members. The government contends that the employer-employee relationship does exist. On the other hand, the taxpayers urgently contend that the district court correctly decided that the captains and crewmen who operated the fishing boats were not employees of the taxpayers within the purview of the above mentioned acts.

---

3. In finding of fact number 5 the district Judge stated, "All repairs were made by and paid for by the plaintiffs." In finding number 20 he stated, "Boat repairs and maintenance costs, which were substantial, were the expense of plaintiffs."

4. The facts herein outlined are without material dispute and are based upon the facts found by the trial court. The trial court made no mention of the fact that income tax payments were withheld from payments made to the captains and individual crew members. The government also calls attention to its Exhibit 8 which reflects that in a personal injury case under the Jones Act, two of the taxpayer partners conceded the employee status of an injured crew member in litigation which arose in the Northern District of Florida in 1967.

Taxpayers argue for the application of a sort of brackish form of land-based common law principles.[5] We must reject this contention. This case cannot be decided according to land-based common law or upon theories that are a mixture of common law and maritime law. We must move entirely away from the shore to the wide, open sea. Justice Harlan aptly stated the rule when he concluded tersely that maritime law is "the common law of seafaring men."[6]

The issue with which we deal here is not new to this court. When United States v. W. M. Webb, Inc.[7] made its first appearance in this court, under facts not greatly dissimilar from those involved in the instant case, we applied common-law rules because we considered that the tax statutes, there discussed and here involved, compelled a decision on the basis of common-law standards. At that time we emphasized the fact that if the court were free to apply maritime law as a test of the employer-employee relationship, the district court's decision could not stand.[8]

In reversing our first *Webb* decision the Supreme Court made it unmistakably clear that we committed error in applying common-law principles and in declining to determine the status of the captains and crewmen against standards of maritime law. The Court squarely rejected the argument that the legislative history and the applicable tax statutes indicated a congressional intent to apply land-based standards to maritime activities. The Court could not accept the thought that Congress intended "the anomalous result" of judging maritime

5. In its brief the taxpayers characterize the ruling of the district court as follows:

> The District Court determined that an insufficient degree of control was exercised by the taxpayer-boat-owners over the captains and crewmen to create an employer-employee relationship under the common law rules in the context of a fishing operation.

At other points in the brief it is stated:

> The factors comprising the "usual common law rules" defining "employees" became integrated with existing general maritime law.
>
> \* \* \* \* \*
>
> It was obvious from the findings that the District Court had the common law test clearly in mind.
>
> While we do not agree with the district court's application of the standards of maritime law, it is obvious to us that the court felt bound by maritime law rather than common law standards. Nevertheless, in its application of maritime law the court excluded consideration of cases involving the Jones Act and cases involving maintenance and cure.

6. In United States v. Webb, 397 U.S. 179 at 191, 90 S.Ct. 850, 856, 25 L.Ed. 2d 207 at 215 (1970) Justice Harlan stated:

> Maritime law, the common law of seafaring men, provides an established network of rules and distinctions that are practically suited to the necessities of the sea, just as land-based decisional law provides a body of rules adapted to the various forms of domestic employment. The goal of minimizing uncertainty can be accomplished, in the maritime field, by resort to the "usual" rules of maritime jurisprudence. (footnote omitted).

7. 402 F.2d 956 (5th Cir. 1968).

8. In our first *Webb* decision we stated:

> The "'ancient solicitude of courts of admiralty [sic] for those who labor at sea' continues unchanged, despite the progress from canvas sails to diesel engines." In nontax context when courts are asked to determine whether seamen are employees of the vessel's owner, all ambiguities or doubts are resolved in favor of the seaman. Today, the law is clear that in both categories of cases—Jones Act, and maintenance and cure—the owner of the vessel is the employer unless the vessel is held under a demise charter. The arrangements here certainly did not constitute demise charters. If we were free to apply maritime law as a test of the employer-employee relationship, we would reverse the decision of the district court. This is so because it is clear that under maritime law the captain is the agent of the owner (on the facts here) and the crew hands are employees.

activities by standards which are not relevant to seafaring enterprises. Proceeding a step further, the Court strongly indicated that under maritime law control is the most important factor. Succinctly stated, the Court concluded that:

[E]xcept where there is nearby total relinquishment of control through a bareboat or demise, charter, the owner may nevertheless be considered, under maritime law, to have sufficient control to be charged with the duties of an employer.[9]

Upon remand we followed the foregoing analysis of the Supreme Court's decision in *Webb*. We recognized the crucial legal issue to be whether under maritime law the captains and crewmen were employees of the shipowner within the meaning of the Federal Insurance Contributions Act and the Federal Unemployment Tax Act. Applying maritime law we decided that the relationship was that of employer-employee. We ordered the complaints of the taxpayers dismissed and concluded:

The Supreme Court held that this Court "erred in declining to judge the status of the captains and crewmen against the standards of maritime law." This holding, coupled with our earlier conclusion that under maritime law the captain is the agent of the

owner and the crew hands are employees, leaves no room for further argument as to the appropriate disposition of this case.[10]

Moreover, prior to the Supreme Court decision in *Webb* this court had occasion to consider the validity of a seaman's claim in an action to recover from the owner of a fishing vessel for personal injuries sustained during oyster dredging operations.[11] In Stevens v. Seacoast Company we considered the seaman's claim against the shipowner's contention that the master of the fishing vessel was the bareboat charterer or "a sort of seagoing independent contractor carrying on a joint venture with fellow crew members." The shipowner argued that this arrangement made the seaman an employee of the master and not the owner of the ship. We rejected this contention and found that the seaman was an employee of the ship owner. We discussed the matter of control and held the demise charter test to be the proper standard for defining the relationship between vessel owners and seamen under admiralty law—the Jones Act. We expressly emphasized the congressional policy to assure day-by-day protection to seamen.[12]

The case *sub judice* is not one "where there is nearly total relinquishment of control through a bareboat or

9. 397 U.S. at 192, 90 S.Ct. at 856, 25 L.Ed.2d at 216.

10. 424 F.2d 1070 at 1071.

11. Stevens v. Seacoast Co., 414 F.2d 1032 (5th Cir. 1969). The first *Webb* decision was decided November 6, 1968, the Supreme Court decision March 3, 1970, *Stevens* was decided on August 13, 1969, and our decision on remand in *Webb* was on June 4, 1970.

12. We concluded:
[T]he fact that there is no tenure or substantial duration in point of time to the arrangement between Shipowner and Master so that at the first moment the "independent" contractor displeases the shipowner the agreement can be

revoked at will, it demonstrates that no real possessory rights are invested in the so-called charterer. But this is the essential requisite of a demise charter to distinguish it from time and voyage charters and the like.
At 1036.
\* \* \* \* \*
The Jones Act itself is in sweeping terms. Incorporating as it does the Federal Employers' Liability Act, the Jones Act protects seafaring workers against all manner of contracts and agreements which undertake to lessen or avoid the strict responsibilities imposed by Congress upon the employers of seamen.
At 1038.
(footnotes omitted).

demise charter." Under the facts disclosed by the record we are compelled to reach the conclusion that the agreements here involved between the boat owners and the captains resulted in an employer-employee relationship between the taxpayers on the one hand and the captains and the crewmen on the other. The arrangements between the shipowners and the captains did not constitute a bareboat or demise charter. We do not find it necessary to define in precise, technical terms the meaning of bareboat or demise charter in all circumstances and under other conceivable facts. It is sufficient to say that such charters are characterized by a relinquishment of possession, command and navigation and almost total relinquishment of control.[13]

In view of our conclusion that the taxpayers were employers of the captains and the crewmen they are not entitled to a refund of the taxes paid. The case is remanded to the district court with instructions to enter judgment for the government and to dismiss the complaint of the taxpayers.

Reversed with directions.

13. Both the courts and the commentators have defined "demise charter" similarly. The following citations are representative: Guzman v. Pichirilo, 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962) ("To create a demise the owner of the vessel must completely and exclusively relinquish 'possession, command and navigation' thereof to the demisee."). Reed v. S. S. Yaka, 373 U.S. 410, 412, 83 S.Ct. 1349, 1352, 10 L.Ed.2d 448 (1963) ("full possession and control are delivered up to the charterer for a period of time"); Reed v. United States, 11 Wall 591, 601, 20 L.Ed. 220 (1870) ("Unless the ship itself is let to hire, and the owner parts with the possession, command and navigation of the same, the charterer or freighter is not to be regarded as the owner. * * *"); Stevens v. Seacoast Co., 414 F.2d 1032, 1035–1037 (5th Cir. 1969); Bergan v. Int'l Freighting Corp., 254 F.2d 231, 232 (2d Cir. 1958) ("Under a demise or bareboat charter, the shipowner parts with all possession of the ship and gives the charterer an interest in it akin to that of a lessee of real property. * * *"); Vitozi v. Balboa Shipping Co., 163 F.2d 286, 287 (1st Cir. 1947) (demise charter "in that by its terms the owner gave to the charterer 'possession, command, and navigation of the ship' for a stipulated period of time"); Romano v. West India Fruit and Steamship Co., 151 F.2d 727, 729 (5th Cir. 1945) ("The rule is clear that there is a demise where the charterer is given the possession and control of the vessel"); The Norland, 101 F.2d 967, 971, 9 Alaska 471 (9th Cir. 1939) ("The test of whether a charter is a complete demise of a vessel so as to make the charterer owner pro hac vice is whether the entire command and possession of the vessel, and consequent control over its navigation has been surrendered"); E. Benedict, The Law of American Admiralty § 96 at 130 n. 37 (Supp.1971); G. Gilmore and C. Black, The Law of Admiralty, 215–19 (1957).