476 F.2d 977
 T. L. BISHOP et al., Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
Joe MAGEE et al., Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
Nathan BOUDOIN et al., Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
GULF TRAWLERS, INC., Sidney E. Herndon, d/b/a Herndon Marine
Products Co., Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
JOHNSON & JOHNSON PROCESSORS, INC., Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 71-3550.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 27, 1973.
 
 Ben A. Douglas, Atty., Tax Div., Dept. of Justice, Dallas, Tex., Anthony J. P. Farris, U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., Scott P. Crampton, Asst. Atty. Gen., Tax Div., Meyer Rothwacks, Chief, Appellate Section, Issie L. Jenkins, Atty., Dept. of Justice, Washington, D. C., for defendant-appellant.
 Joseph J. Lyman, Washington, D. C., Eli Mayfield, Palacios, Tex., for plaintiffs-appellees.
 Before JOHN R. BROWN, Chief Judge, and GODBOLD and SIMPSON, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 The ten year Odyssey of who is the employer-shipmaster or shipowner-of crew members of fishing vessels working on a lay for the payment of FICA and FUTA taxes commenced in an abortive effort to enjoin the Government, Enochs v. Williams Packing Co., 1962, 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292; but followed shortly by the unfavorable decision to the Government in Crawford Packing Co. v. United States, S.D., Texas, 1962, 228 F.Supp. 549, aff'd., 5 Cir., 1964, 330 F.2d 194, sustained momentarily in Webb I, United States v. Webb, Inc., 5 Cir., 1968, 402 F.2d 956, but stranded by Supreme Court reversal, 1970, 397 U.S. 179, 90 S.Ct. 850, 25 L. Ed.2d 207, with a holding for the Government in Webb II on remand to us, United States v. Webb, Inc., 5 Cir., 1970, 424 F.2d 1070, and extended articulation of controlling principles in Anderson v. United States, 5 Cir., October 1971, 450 F.2d 567; may hopefully, cf. Parr v. United States, 5 Cir., 1972, 469 F.2d 1156, be closer to an end as we dispose of a series of cases[1] decided subsequent to our per curiam reversal in Webb II, but prior to our October 1971 decision in Anderson.
 
 
 2
 We hold that the seamen are employees of the shipowner, not the shipmaster, and once again reverse.
 
 
 3
 To bring this nearer to a close what we write is not for those to read who run. Without repetition we start against the background of what has been written and done before. But in the quest for standards to guide both litigants and District Courts we think some things merit brief discussion.
 
 
 4
 As before, our contrary conclusion does not rest on a rejection of the trial Judge's findings of fact, so we need not resolve the oft-times troublesome problem of deciding whether our review is of facts as to which the Plimsoll line of F. R.Civ.P. 52(a) cases is the determinant or whether it is a case for unrestricted review as a question of law. We simply determine that the facts found by the District Court[2] are not significantly different from those in Anderson and-as there and in Webb II-we hold that they are insufficient to make out the requisite surrender of control of the vessel by her owner to the master. With that we could perhaps rest without saying more. But in view of the tenacity of counsel for all of the litigating shipowners who has persevered undaunted with that "ant-like persistence of solicitors," Lyon v. Boh, S.D.N.Y., 1924, 1 F. 2d 48, 50, we think some further discussion is appropriate.
 
 
 5
 Having failed in Anderson for "application of a sort of brackish form of land-based common law principles," 450 F.2d at 570 and n. 5, the taxpayers no longer urge us to dilute its salinity. What they seek now is not a maritime law for the Medes and Persians which altereth not. Rather they seek a maritime law of demise charter for injury-death-Jones Act-Sieracki-Ryan-Yaka purposes on a stricter "humanitarian" basis and another parallel, but much looser, standard for "commercial" purposes which would obviously include tax cases.
 
 
 6
 This argument is essentially built on the cautious words of the Supreme Court as it (i) held that maritime standards should control but (ii) did not undertake to assay either what that law was or what the Fifth Circuit would or should do under it.
 
 
 7
 In Webb I we stated that if "* * * we were free to apply maritime law * * * we would reverse * * * because it is clear that under maritime law the captain is the agent of the owner * * * and the crew hands are employees."[3] Because in this Webb I discussion we had referred to injury/death/Jones Act situations, shipowners then focused on the Supreme Court's reservation: "We are not called upon to, and do not, intimate any view on the correctness of the Court of Appeal's statement on this score." 397 U. S. at 182, n. 4, 90 S.Ct. at 851, n. 4, 25 L.Ed.2d at 210, n. 4.[4]
 
 
 8
 But this argument is not sound and, worse, it is two cases too late so far as this panel's ability or willingness to take action short of an en banc-which we do not suggest. Of importance to the Supreme Court was the question-and its decision-of maritime principles. Having decided that, it properly left the elucidation of those principles to the lower courts. And when it came back to us in Webb II we effectively answered the question that such injury/death cases were a proper source of maritime law.[5] And this was reiterated in Anderson.
 
 
 9
 But, more fundamentally, there is no basis for thinking, as the District Judge characterized it, that courts have "deviated from the general maritime law in personal injury cases"[6] in determining the existence of a demise charter. There is but a single, not as urged a double, standard: Has the shipowner surrendered virtually complete possession, control and navigation to the nonowner (charterer)? If so, it is, if not, it's not, a demise.[7]
 
 
 10
 More than that, the law respecting injury/death is not some recent intrusion on maritime law. It is a part of the whole. What the maritime jurisprudence would compel is to be influenced by its presence as a part of the whole, not as some supposed outside, foreign principle. And as with any growing decisional-oriented body of law, current developments in response to contemporary problems may well bring about a modification of formerly settled principles in related or adjacent areas.
 
 
 11
 In Webb II and Anderson we have not depended solely on injury/death holdings. But they have been, now are, and will be-along with the full body of charter party law-a significant permissible source for the conclusion that these arrangements lack that "nearly total relinquishment of control" to constitute "a bare boat, or demise, charter", 397 U.S. at 192, 90 S.Ct. at 856, 25 L.Ed.2d at 216.
 
 
 12
 We need not catalogue beyond that done in Anderson the factors, plus or minus, bearing on demise. One is critical, another significant. Although in practice the masters chosen to take over a vessel tended to serve for a considerable time, the Court expressly found that either could terminate at any time-certainly on sale of the catch at the port of arrival. Considering the relative economic disparity between the owner of an expensive ocean-going vessel with high costs for operation, bunkering, maintenance and insurance, and a prospective master whose only investment in the enterprise is his time and energy, this right to terminate is a powerful force. The notion that such a master really has the full command, possession and control of the ship to do as he pleases in that fishing trade is simply not realistic. See Stevens v. Seacoast Co., 5 Cir., 1969, 414 F.2d 1032.
 
 
 13
 That leads to the other factor we described as significant. Except for extraordinary situations the master was to deliver the catch for sale or receipt at a specified place. Lacking any real economic independence in the employment of the vessel vis-a-vis the shipowner, the master and his crew are really a part of the owner's enterprise and all of the various parts of the arrangement are simply a means of calculating compensation.
 
 
 14
 The so-called independence of these masters from detailed orders on how to perform their work is beguiling. But this is not unique to the arrangement. This inheres in the calling of those who go down to the sea in ships. On the most obscure of vessels the master is the Lord of the Quarter Deck. See United Geophysical Co. v. Vela, 5 Cir., 1956, 231 F.2d 816, 819.[8] He may receive a barrage of radio messages but he is in command. Indeed, reserving the right to direct navigational details would violate not only the traditions of the sea which form a significant part of maritime law, but would also expose such an unwitting owner to a certain loss of his right to limitation of liability, 46 U.S.C.A. Sec. 183 et seq.[9]
 
 
 15
 On the saline standards of maritime law-the common law of the sea-the shipowners retained significant control and the master and crew members are his employees for life, death and taxes.
 
 
 16
 Reversed.
 
 
 
 [1]
 Elizabeth Ann, Inc. v. United States, 5 Cir., 1973, 476 F.2d 980; Carleen F, Inc. v. United States, 5 Cir., 1973, 476 F.2d 981; Mayport Fisheries Company v. United States, 5 Cir., 1973, 476 F.2d 981
 
 
 [2]
 See Bishop v. United States, S.D.Texas, May 1971, 334 F.Supp. 415, 421-425, for the Court's finding of fact
 
 
 [3]
 See Anderson, 450 F.2d 570, n. 8, which quotes in full from Webb I
 
 
 [4]
 This was preceded by the recital from our Webb I (see note 3, supra) and the Court's statement:
 "It [Court of Appeals] reviewed the facts and observed that 'it is clear that under maritime law the captain is the agent of the owner * * * and the crew hands are employees,' and that 'if we were free to apply maritime law as a test of the employer-employee relationship we would reverse the decision of the district court.' "
 397 U.S. at 182, 90 S.Ct. at 851, 25 L. Ed.2d at 210.
 
 
 [5]
 Certiorari was denied, 1970, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed. 138 but the Court is free and just might, re-review it in the current cases. See Hughes Tool Co. v. TWA, 1973, 409 U.S. 363, n. 1, 93 S.Ct. 647, 34 L.Ed.2d 577 [January 10, 1973]
 
 
 [6]
 "The courts have deviated from the general maritime law in personal injury and wrongful death cases by requiring, for humanitarian reasons, that fishermen, being wards of the sea, not be precluded ipso facto from recovery simply by the construction of an implied demise. The Court does not believe that cases which create an enlarged standard for humanitarian purposes should be considered as changing the general maritime law or the maritime common law."
 D.C., 334 F.Supp. at 418.
 
 
 [7]
 We cannot improve on Anderson, 450 F.2d at 572, n. 13, in the articulation of criteria
 
 
 [8]
 In Vela we made the following observation about the authority of the ship master:
 "But navigation in these circumstances is left neither to Judges nor the Elder Brethren of Trinity House nor those who, in the garb of experts, from the security of a swivel chair now lay out the course with great conviction. "The master is the commander of the ship-lord of his little world. He is master in every sense of the word * * *" The Balsa, 3 Cir., 10 F.2d 408, 409. Whether he has bridge or quarterdeck to stalk, as long as he commands, he is master. It is the Master, then, who must make these decisions and who, clothed with great responsibility, enjoys the greatest and widest of good faith latitude in professional judgment."
 231 F.2d at 819. But see Avera v. Florida Towing Corp., 5 Cir., 1963, 322 F.2d 155, 164; Boudoin v. McDermott & Co., 5 Cir., 1960, 281 F.2d 81, 87.
 
 
 [9]
 Shipowners stress some early cases which have held in their situations that to be a demise the charterer did not have to provide fuel, stores, victuals, etc. Significantly, Congress requires this to qualify as a vessel owner for limitation of liability, 46 U.S.C.A. Sec. 186