**Richard J. STEPHENSON, Plaintiff,**

v.

**STAR–KIST CARIBE, INC., Defendant.**

**Civ. No. 332–68.**

United States District Court,
D. Puerto Rico.

Nov. 30, 1976.

Feldstein, Gelpí, Toro & Hernández, San Juan, P. R., for plaintiff.

Calderón, Rosa Silva & Vargas, Hato Rey, P. R., for defendant.

MEMORANDUM OPINION AND ORDER

PESQUERA, District Judge.

This personal injury action was commenced by Richard J. Stephenson for injuries allegedly suffered while in the course of his employment as a seaman on board the F/V GOLDEN SCARAB. The complaint alleges that on November 13, 1968, defendant, Star-Kist Caribe, Inc. owned, operated and controlled the aforesaid vessel and consequently is liable for the negligence and unseaworthiness, which allegedly produced plaintiff's injuries.

Defendant denies owning, controlling or operating the F/V GOLDEN SCARAB. The issue to be ruled upon is whether defendant exercised such control over the vessel F/V GOLDEN SCARAB, as to render it an owner *pro hac vice* of the same and therefore, liable for plaintiff's injuries.[1] There is no dispute as to the fact that the vessel was owned by Scarab Fishing Ventures, Ltd., a Canadian corporation. Likewise, there appears to be no substantial dispute as to the manner in which the accident and injury occurred.[2] Neither is there any controversy about the agreements executed by and between defendant and Scarab Fishing Ventures, Ltd. and on which both parties rely in support of their respective contentions.

Adjudication of the issue submitted turns upon the agreement between defendant and Scarab Fishing Ventures, Ltd. and the course of conduct followed by each of these parties in the execution of the same. The agreements speak for themselves. The first is a "Loan Agreement" whereby defendant advances to Scarab Fishing Ventures, Ltd. the sum of $15,000.00, which funds were disbursed directly to creditors of the F/V GOLDEN SCARAB.

A promissory demand note was executed as part of said agreement, payment of which would be on demand except for the following: "($15,000 from proceeds of first voyage; (2) $3,750 from each succeeding voyage until paid".

At the same time, defendant and Scarab Fishing Ventures, Ltd., also executed an "Agreement for the Sale and Purchase of Fish", which in essence, provided for the following:

1. All the production of yellowfish and skipjack tuna suitable for canning would be sold to defendant, at prevailing market prices, less storage, handling, freight and insurance from port of delivering to Mayaguez, Puerto Rico.

2. The F/V GOLDEN SCARAB was to operate only along the coast of West Africa and any relocation of its operating area required defendant's consent and a supplemental agreement to detail conditions of such relocated operation.

3. Final payment would be based upon weight received at cannery in Mayaguez, less any rejects. Rejects were to be calculated and charged according to industry practice at Puerto Rico.

4. Any fish not required by Star-Kist Caribe, Inc. could be sold in Europe and Africa through the Star-Kist's sales network at an established rate for such service.

5. The agreement would have been in effect until December 31, 1969 or as long as the vessel was indebted to Star-Kist, whichever was longer.

6. The terms and conditions of the Loan Agreement were included in and formed part of this agreement.

---

1. A prior motion for summary judgment on this identical issue was denied by the Court. (Opinion and Order, filed and entered May 8, 1973). At this time, however, the parties have stipulated to submit for adjudication the merits of the controversy on the basis of depositions of witnesses, as if and to the same extent a plenary trial had been held.

2. The only testimony on this fact is that of the Master Norman Ryall, who stated that as the net was being hoisted, he saw a sunfish trapped up near the block. He admitted having yelled to the men below about the existing peril but does not believe that they heard him. He did not order the operation stopped to remove the fish, which according to him would have been the safest procedure. He also admitted that the fish fell because the net was in a defective condition.

7. Star-Kist was to appoint ship's agents at African ports where it maintained bases to handle and service F/V GOLDEN SCARAB whenever it entered such ports. At Tema Ghana, Star-Kist Int., S.A. was appointed agent under a regular schedule of charges for services.

8. Star-Kist was to arrange the necessary fishing licenses and permission to land fish in Ghana and operate in Ghanan waters.

Defendant asserts that aside from these agreements and the obligations imposed upon Scarab Fishing Ventures, Ltd., "there was no further control as to the movements of the vessel". It relies on isolated parts of the Master's testimony at page 30 of his deposition to support its contention. Although the Master's deposition states "No one told me where to go, you know what I mean? Where we wanted to go fishing, we went fishing, you know what I mean?", he also stated:

"But it is a very tenuous sort of control, in that the dollars are always there. There's always the dollars come into the picture; and your actions, your movements, what you are going to do, it has to fall in line with that they, with their wishes; otherwise it doesn't transpire." (Transcript p. 30)

█ It is evident that once the vessel left port, Star-Kist had no control over the exact place and time where fishing would be conducted, for as Captain Ryall puts it, "it is impossible for people ashore to instruct you on how to catch fish at sea" and the decision as the amount of fish to be caught was made by "God and myself". (Transcript p. 62) Thus, even though at the time of the accident, the vessel was beyond the physical control of Star-Kist, such situation would not be a significant factor in the determination of the issue of control.

In order to determine the extent of Star-Kist's control over the vessel, it is necessary to examine the testimony of the Master with respect to the facts and circumstances under which the existing contracts were executed.[3]

a) Production of the vessel would be turned over to Star-Kist, the proceeds of which would be applied to the debt. (Ryall p. 26)

b) Star-Kist made necessary arrangements for drydocking overhauling, provisions supplies and oil—"In other words, the day to day operations of the vessel". (Ryall, p. 27)

c) Star-Kist entered substantially into the administration of the vessel, paying the crew and captain Ryall. (Ryall, p. 26)

d) All purchases would be charged to Star-Kist which in turn would deduct these charges from the catch. (Ryall, p. 28)

e) Star-Kist had the final say over what equipment to buy. (Ryall, pp. 30–31)

f) Payment of the crew was done by Star-Kist's employees on the dock in Tema Ghana. (Ryall, p. 35)

g) Star-Kist paid for Stephenson's airplane tickets, and travelling expenses from California to Africa. After the accident, it also paid for his airline ticket to return to the United States. Star-Kist also paid travelling expenses for another seaman by the name of Vince Guarris. (Ryall, p. 40)

h) Captain Ryall needed a mast man and a deck boss so he told Star-Kist and four or five days later, Vince Guarris and Stephenson showed up. (Ryall, p. 40)

i) When Ryall assumed command of the vessel, the Captain, chief engineers and other fishermen had left the vessel. Star-Kist had bought their tickets and flew them home. (Ryall, pp. 39–40)

j) The chief engineer had been a Star-Kist man. (Ryall, p. 39)

The existing facts and circumstances as related by Captain Ryall, are clearly indicative that Star-Kist's role in the operations of the F/V GOLDEN SCARAB went far beyond that of a mere lender. The ultimate disposition of the fish caught and the

---

3. It must be pointed out, that the Master of the vessel at the time of the accident was Norman

Ryall, who also had 51% of the shares of Scarab Fishing Ventures, Ltd.

revenues produced thereby, were within the exclusive control of Star-Kist, which would also handle the accounting for the vessel. If at the end, any money was left, it would be turned over to the shipowner. (Ryall, pp. 35–36) Thus by controlling the funds, Star-Kist was able to exercise as effective a control as if it had been its owner. Thus, the mere fact that Captain Ryall could fish where and when he wanted, in no way detracts from the effective control that it exercised over the vessel's operation and trade. Rare would be the vessel whose master were denied control once the vessel got underway; and stranger yet would be the situation where the owner would undertake swivel-chair navigation to tell the master to turn to, stay put, or seek a heaven. (*Stevens v. Seacoast Company*, 414 F.2d 1032, 1036) In conclusion, the facts presented to the Court clearly establish that Star-Kist, through the agreements with Scarab Fishing Ventures, Ltd., had and did in fact exercised an owner-like control over the F/V GOLDEN SCARAB and that whatever legal labels may appropriately fit the existing relationship, the sheer reality was that without the funds, the vessel could not even get under way. To this extent, Ryall's authority or control was subject to the overriding wishes of Star-Kist.

Stephenson's role in this enterprise is also a significant factor in the determination of the controversy. The record clearly establishes that he was not hired by Ryall and that he had not known him prior to the moment when Star-Kist brought him to Africa to join the F/V GOLDEN SCARAB. The record is not clear whether Star-Kist personally contacted Stephenson or whether he was contacted by Vince Guarris who was in fact contacted by a Star-Kist officer. In any event, the reality is that without Star-Kist's intervention, neither Guarris nor Stephenson would have on their own, flown to Africa to join the GOLDEN SCARAB. Thus, directly or indirectly, Star-Kist did participate in Stephenson's employment aboard the vessel and, therefore, considering the effective control and interest over the vessel and the outcome of the enterprise, it cannot escape its responsibilities over the welfare of these seamen.

The seaman's right to a seaworthy and safe vessel and to maintenance and cure for injuries received while in the service of the vessel, is deeply rooted in our Maritime Law. (*The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 700.) A ship is unquestionably a uniquely hazardous place to work and for that reason, shipowners and operators have been required to provide a seaworthy vessel. (*Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.) The duty imposed is an absolute one and requires that the vessel furnished and its appurtenances be reasonably fit for its intended purpose. The standard is not absolute perfection, but reasonable fitness for her intended service. (*Mitchell v. The Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941; *Boudoin v. Lykes Bros. SS Co.*, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354.)

Those principles which have been judicially developed to protect those who are less able to bear the losses resulting from a failure to comply with the duty imposed, requires this Court to fashion a remedy concomitant therewith. As such, it becomes necessary once again to examine the relation between defendant and Scarab Fishing Ventures, Ltd. It is clear that the latter entered into the agreements with Star-Kist in an effort to salvage an already financially floundering enterprise. Thus, Star-Kist cannot reasonably be presumed to have been ignorant of the economic situation of the shipowner; on the contrary, it is more reasonable than not that through this agreement Star-Kist was able to secure the raw material essential for its business while at the same time, provide reasonable security for its investment. By obtaining the production and managing the funds of the vessel, it at least assured substantial control over the operations of the vessel. Without such an arrangement, it would neither have secured the fish nor guaranteed repayment of its loan.

Likewise, it is reasonable to conclude that Star-Kist also had an interest in ensuring

that the vessel was able to catch fish successfully. To assure this objective, it sought out the men requested by Ryall and arranged to have them transported to Africa. It is difficult to understand why these men were brought from such distance, when abundant, less expensive labor was available in Africa and Europe, unless it wanted to further assure the operation by having on board American citizens in whom it could trust. It must be remembered that the vessel was of Canadian registry and it was precisely when the principal stockholder took command that Guarris and Stephenson were brought in.

■ It is clear that Star-Kist was instrumental in Stephenson's employment aboard the F/V GOLDEN SCARAB. The record is devoid of testimony from which to conclude that before shipping Stephenson and Guarris to Africa, Star-Kist advised them of the precarious financial condition of the F/V GOLDEN SCARAB. Neither is there any testimony to show that in accepting employment on that vessel, their sole remedy for unseaworthiness and maintenance and cure would be that which the insolvent shipowner could afford. Seamen are in a sense wards of the Admiralty Courts, and as such the Court is bound to examine with great care, any relation, contractual or otherwise, whereby the rights and remedies of these may result affected, lessened, eliminated or even placed in jeopardy. Defendant's effective control of the vessel and its role in the employment of plaintiff require this Court to extend to it the responsibilities of the insolvent shipowner.

Based on the foregoing, the Court concludes that as a matter of law, defendant is liable to plaintiff for his injuries and damages suffered on November 13, 1968. Interlocutory partial judgment on the issue of liability will be entered accordingly, and upon adjudication of the issue of damages, final judgment will be entered.