Mrs. Julian Lamar **DAVIS**, Temporary Administratrix of the Estate of Charles Edward Davis, Deceased, Appellant,

v.

**PARKHILL–GOODLOE COMPANY**, Inc., Appellee.

No. 19294.

United States Court of Appeals
Fifth Circuit.

May 2, 1962.

Rehearing Denied June 5, 1962.

490

Joseph B. Bergen, Savannah, Ga., for appellant.

Harry T. Gray, Jacksonville, Fla., for appellee.

Before TUTTLE, Chief Judge, and BROWN and BELL, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question presented is whether the trial Court erred in entering judgment for the shipowner in this Jones Act case for damages sustained by the seaman and his survivors by reason of his

death suffered in line of duty.[1] We hold that it did and reverse. The case was brought as a Civil Action rather than as a libel in admiralty. But the standard of review is now substantially the same since after formal demand for a jury trial, F.R.Civ.P. 38(b), 28 U.S.C.A., the parties expressly consented to a trial by the Court. This brings into play then F.R.Civ.P. 52(a) and the concept of "clearly erroneous" now incorporated into admiralty causes. Myles v. Quinn Menhaden Fisheries, 5 Cir., 1962, 302 F.2d 146; O/Y Finlayson-Forssa A/B v. Pan Atlantic S. S. Corp., 5 Cir., 1958, 259 F. 2d 11, 13, 1958 A.M.C. 2070. Here the most critical aspect of that standard of review is that findings induced by or resulting from, a misapprehension of controlling substantive principles lose the insulation of F.R.Civ.P. 52(a) and a judgment based thereon cannot stand. McGowan v. United States, 5 Cir., 1961, 296 F.2d 252, 254.

▪ Charles Edward Davis, the decedent, was a young 24-year-old Georgia farm boy. His nautical career began on the Dredge Ideal then working in the Savannah River. Ten days later it ended with his death. He was a robust, healthy young man of good traits and mentality and had taken considerable college work in the agricultural sciences to fit him, so his parents stated without contradiction, for the life of a Georgia farmer. This is important, not alone on the damage question, but more so from the standpoint of the duty owed by the ship to this untutored, inexperienced, green-hand.

The Ideal was engaged in sweeping out a slip near the north bank of the River. As a hydraulic cutter dredge, she was equipped with the typical discharge line made up of sections of 16″ pipe. The 16″ discharge line was mounted on metal drum-like pontoons. The discharge line led aft (westerly) for about 100 feet from the dredge's stern and then made a substantial right angle turn to the south running approximately 600 feet to the south shore. From there, the line led ashore several hundred additional feet into the spill area. A narrow 10″ plank ran along the top of the discharge line to provide a walkway. A single hand rail on vertical stanchions paralleled the pipe. Where the pipe sections joined, there was a rubber joint. This left a space, however, of two to three feet between the ends of the walkway planks.

On the afternoon of November 27, 1957, a bright, warm, sunshiny day, Davis was last seen walking toward the shore 100 feet or so shoreward from the elbow. Some time the next day his body was found floating in the water in this same general vicinity. Save for the inexplainable absence of his low cut shoes which he had been wearing, the body bore no signs of any unusual nature. The prosecutor's autopsy report and testimony concluded the death was due to drowning.

At the time he was last seen, Davis was where he was supposed to be, doing what he was supposed to do. In accordance with authoritative instructions, he was returning to the shore to assist another crew member in repair of a leaking joint in the discharge line at a point near the spill area on land. He and others had been doing this repair work during the morning and had returned to the dredge via the walkway for the noonday meal.

▪ The plaintiff did not claim that this unexplained disappearance of Davis while in the course of his duty using facilities provided for just such purpose gave rise to any presumptions as such. The claim was urged, and properly so, Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668, 1956 A.M.C. 737, that circumstantial evidence warranted inferences of negligent breach of duty proximately causing death by drowning.

---

1. By previous order of this Court, the appeal was allowed without prepayment of costs as a suit to enforce laws enacted for the protection of seamen under 28 U.S.C.A. § 1916.

■ The plaintiff made out a rather formidable showing. The witnesses presented included the inspector of the company for whom the dredging work was being done by the defendant shipowner, several persons who had long experience as safety engineers on dredging operations, and some others who had observed the condition of the walkway, guard rail, etc. on the pontoon discharge line. The most significant, however, was the Master of the dredge, called properly as an adverse witness, F.R.Civ.P. 43(b), and whose testimony was not binding[2] but which, as we see it, left the shipowner's liability defense in imminent peril of foundering by establishing at least one breach of duty as a matter of law.

Much of the evidence concentrated on the condition of the walkway, the sufficiency of the width of the plank, its general condition, the presence of ropes, lines, and wires strewn across the walkway from place to place, the location, the angle and sufficiency of the single hand rail, and the like.[3] Despite this testimony, the Court chose generally to credit the controverting evidence from the shipowner. For our present purposes, we accept this under F.R.Civ.P. 52(a). In doing so, however, we do not ignore, indeed we emphasize, the undisputed physical nature, and the unusual hazardous condition, of this facility.

It was this actual setting, even though described in terms most favorable to the shipowner's cause, which made the testimony of the dredge Master so decisive.

It is at one in committing the shipowner to negligence as a matter of law, and in demonstrating that the trial Judge was laboring under a significant misapprehension of legal principles.

This testimony was that relating to the availability and use of life vests and the instructions to the crew concerning their use. It does not turn on the actual availability since it is undisputed that life vests were available in sufficient quantities. But indulging in favor of the shipowner every variation in the Master's testimony, it revealed that whether this essential lifesaving equipment was to be used while working on the pontoon discharge walkway was left to the sole judgment of the particular seaman at the time. Only one qualification to this policy was acknowledged: one who could not swim would be compelled to wear or use them. Otherwise it was for the seaman to determine whether such safety equipment was needed. Repeated and repeated were statements by the Master, "Well, we don't require a man to wear one if he doesn't want to * * * "; "* * * It is up to the individual himself if he wants to wear" them; life jackets are "* * * there for him to wear if he wants to. It is up to the man * * *"; as the "* * * instructions are to wear them * * * if they feel they need to wear them * * *."

But such a practice was to fly in the face of the accumulated experience of mankind in the struggle against the hazards of the cruel sea. Cf. Pure Oil

---

2. June T., Inc. v. King, 5 Cir., 1961, 290 F.2d 404, 406, n. 1, 1961 A.M.C. 1410; Fall v. Esso Standard Oil Co., 5 Cir., 1961, 297 F.2d 411, 417.

3. The record development of some of this seems quite unusual. The plaintiff's counsel examined witnesses at great length, and they were cross examined as extensively, as to a large number of photographs identified by specific exhibit numbers. The examination and cross examination developed fully the circumstances under which they were taken, the dissimilarity or similarity of conditions existing or portrayed, or both, in contrast to those observed by the particular witnesses at or about the time of the fatal accident.

The evidence from such witnesses was fully received and considered by the trial Court, and likewise by us. It was not stricken, nor was a request to do so made. But then on the formal completion of the oral testimony and the formal proffer of them into evidence, many such photographs were excluded as exhibits. To the extent photographs are identified as portraying conditions observed by witnesses subject to cross examination, the other dissimilarities in point of time, conditions, etc. go more to their weight under appropriate instructions if a jury trial rather than admissibility as such. See McCormick, Evidence, §§ 179–181, especially § 181 at 387–389.

Co. v. Snipes, 5 Cir., 1961, 293 F.2d 60, 65, 66, n. 6 and 9; Grimes v. Raymond Concrete Pile Co., 1958, 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737, 1958 A.M.C. 1014. Moreover, it ignored this shipowner's own affirmation that this nautical wisdom required, at the very minimum, a stringent mandate to use life vests and an adequate program of enforcement to secure compliance. Posted conspicuously in the pilot house for the guidance of all officers was a formal printed "Accident Prevention Plan." Paragraph 1 expressly stated that the "Corps of Engineers' Handbook Requirements, the Associated General Contractors' Manual of Accident Prevention and other recognized standards will be used as guide in making [safety] inspections." And Paragraph 5 brought this down to the plainest terms. "The use of personal protective equipment such as goggles, welders' hoods, gloves, respirators and life preserver work vests will be enforced when and where required for the protection of workmen." And the standards thereby adopted by reference made equally plain what was meant by the words of Paragraph 5, "when and where required for the protection of workmen." [4]

■■ Of course this was not offered, nor is it used by us, to establish a private standard of care as though the suit was for breach of the implied agreement to carry out these precautions. It was

offered, and it is considered by us, as spectacular proof of industry-wide acceptance of the need for extraordinary care in protecting against the very hazards here prevailing. Custom and practice, especially of prudence, is, of course, relevant and significant in equating conduct with that of the law's fictional ordinarily careful shipowner. Schlichter v. Port Arthur Towing Co., 5 Cir., 1961, 288 F.2d 801, 1961 A.M.C. 1164; June T., Inc. v. King, 5 Cir., 1961, 290 F.2d 404, 1961 A.M.C. 1431; Gleason v. Title Guarantee Co., 5 Cir., 1962, 300 F.2d 813.

The shipowner's excuse, echoed by its Master, for not issuing positive instructions to an inexperienced seaman requiring compliance with this perfectly obvious safety requirement is twofold and too weak. First, it says these precautions were required on Government jobs only, and second, life vests are not needed if a man can swim. As to the first, the perils of the seas are the respecter of no person, whether sovereign or citizen. The hazard arises from the operation, not the status of the one who ultimately pays the freight. As to the second, the capacity to swim is a safeguard only so long as the unpredictable occurrence does not render the victim incapable of swimming, or this capability is inadequate to overcome the violent forces at work. The life vest, on the other hand, as the Vice President and General Manager of the Shipowner so

---

4. The Corps of Engineers' Manual was explicit:

"7–16. Life preservers, vests, or belts shall be worn by all persons while—

"a. On floating pipeline, pontoons, rafts, float stages, etc.

"b. On open deck floating plant not equipped with bulwarks, guardrails, or life lines.

"c. On structures extending over or adjacent to water except where proper guardrails or safety belts and life lines are provided."

Related to this was the provision concerning ring life buoys:

"7–17. * * * In addition to location of ring buoys as required by United States Coast Guard, they will be provided so as to furnish the following coverage: * * *

"c. Pipe Line, walkways, wharves, piers, bulkheads, lock walls, scaffolds, platforms, and similar structures extending over or immediately adjacent to water shall have one ring buoy provided at intervals of not more than 200 feet."

Industry acceptance is reflected by the Associated General Contractors' Manual:

"34–3.1 Life Preserver Vests. Life preserver vests should be worn by all personnel working on floating pipe lines, barges not equipped with guard rails, structures extending over the water, while working over the side of any vessel, and while working alone at night or in small craft, except when in an enclosed cabin or cockpit."

eloquently spoke, will, as its name implies, save life.

"A. It is true that we are required to wear jackets on a Government job, but the jackets are a hindrance to you performing your duties like you should. They are bulky. They get in your way. You are liable to get caught with a jacket on, where you wouldn't without a jacket on.

"Q. Would it be a hindrance to a man that fell overboard and knocked his head and rendered him unconscious?

"A. No it wouldn't.

"Q. It would save his life, wouldn't it?

"A. Yes."

■■ Whatever a shipowner might be permitted to do with respect to seasoned hands familiar with the peculiar hazards of the sea, it is plain that it could not absolve itself of the pervading obligation to furnish a seaworthy vessel and exercise a prudent care for seamen by leaving this important decision—to wear or not wear a life vest?—up to this inexperienced, untrained farm boy who had not yet begun to get his sea legs. This is but the application of the familiar principle of salt water, amphibious and land-locked jurisprudence that there is a duty to warn in an effective way of dangers not reasonably known, Pioneer Steamship Co. v. Hill, 6 Cir., 1955, 227 F.2d 262, 264, 1955 A.M.C. 1617, and a duty to take effective action in the light of the particular condition—here inexperience and ignorance of seagoing perils—of the particular seaman, Justillian v. Versaggi, S.D.Tex.1954, 169 F. Supp. 71; Reck v. Pacific-Atlantic Steamship Co., 2 Cir., 1950, 180 F.2d 866, 1950 A.M.C. 744; McDonough v. Buckeye S.S. Co., N.D.Ohio, 1951, 103 F.Supp. 473, affirmed, 6 Cir., 1952, 200 F.2d 558; Tetterton v. Artic Tankers, Inc., E.D.Pa., 1953, 116 F.Supp. 429.

This was a basic fault on the part of the shipowner. It was, likewise, a fundamental error in law on the part of the trial Judge whose decision assumed that the law would permit a shipowner to take this course.

This conclusion would not necessarily require a reversal because the Court in formal findings held that no negligence of the shipowner, whether actual or assumed, proximately caused the seaman's death, and in any case the damage proof failed to show that there was such pecuniary loss as to warrant a suit by the surviving parents who are, of course, secondary beneficiaries under the Jones Act.

■ But we cannot assume that had this careful and experienced trial Judge found, as he was compelled to do, that the shipowner was negligent as a matter of law in not giving adequate instructions to this inexperienced seaman, he would have adhered to the *arguendo* assumption of no proximate cause. It would be hard indeed to make this assumption since had the instruction been given and enforced, Davis would have been wearing a life vest and only the most extraordinary set of circumstances would have then resulted in death by drowning.

■ So, too, would this be true so far as damages are concerned. The oral argument before us was convincing that the District Court was led to make the adverse findings by reason of the shipowner's misapprehension of the law. The approach was that the parents had to prove a *dependency* on their son. That is not the test. The test, unlike that of dependency for "next of kin," is one of pecuniary loss, and that involves the reasonable likelihood of contributions to the parents in the future whether of money or volunteer farm labor, or both. 2 Norris, Seamen § 661.

■ As the case must be reversed and remanded for a new trial with the possibility that it might be tried before jury,[5] we think it appropriate to express-

---

5. A jury having been timely demanded under F.R.Civ.P. 38, the trial Court has great latitude in allowing the parties to restore this to the jury calendar if desired.

ly state that while the evidence in this record is sufficient to warrant a finding favorable to the plaintiffs by the trier of the fact on causation and damages, we do not express any opinion as to what the decision on either one or both of those points should be. For like reasons, we think the Court, on the basis of the actual evidence submitted on that retrial, must determine whether it is sufficient to raise the question of conscious pain and suffering. Great ingenuity was exercised in putting forward a medical theory based upon expert testimony of the probable length of time it took for a person finally to expire in drowning. But there are so many unknowns in this unexplained slipping or falling of Davis into the water, that we should only say that substantial evidence will be required to sustain a finding of consciousness upon which to rest the permissible assumption of pain.[6]

We need only briefly mention that we concur fully in the trial Judge's refusal to grant the plaintiff a default judgment. To have granted it under these circumstances would have been a return to technicalities out of keeping with the aim declared in the very first Rule that "They shall be construed to secure the just, speedy, and inexpensive determination of every action." F.R.Civ. P. 1. This means as Moore states, and we have echoed, General Telephone Corp. v. General Telephone Answering Service, 5 Cir., 1960, 277 F.2d 919, 921; Hiern v. St. Paul-Mercury Indemnity Co., 5 Cir., 1959, 262 F.2d 526, 530, that " * * * Where there are no intervening equities any doubt should, as a general proposition, be resolved in favor of the movant to the end of securing a trial upon the merits." 6 Moore, Federal Practice § 55.10(1) at 1829. This was not, as were the decisions urged by the plaintiff, a situation in which a defendant sought to set aside and vacate a default judgment

theretofore granted. It was, rather, a refusal of the Court to direct the Clerk to enter a default (F.R.Civ.P. 55(a)) and then proceed to render a judgment on the default. F.R.Civ.P. 55(b) (2). Before the expiration of the period allowed under F.R.Civ.P. 12(a) requiring that the answer "be served within 10 days after notice of the court's action" in overruling the shipowner's motion to dismiss, the defendant sought and obtained an extension of time in which to "serve and file" the answer. The answer was, without dispute, timely "served" on counsel by mail as F.R.Civ.P. 5(b) permits. The paper was not, however, "filed" in the Clerk's office at Jacksonville until one day after that extended period.

Assuming that when the Court under F.R.Civ.P. 12(a) "directs otherwise," as to the time for *serving* the answer it can make a requirement of both service and filing—even though this is otherwise covered in Rule F.R.Civ.P. 5(d) which requires only that a paper served "be filed with the court either before service or within a reasonable time thereafter,"—it is plain that the Court had the power to allow a "late" filing. The Rules expressly permit the granting of additional time after the expiration of any such assumed date. F.R.Civ.P. 6(b) (2). If—and the if is a big one—it was an error on the part of counsel for the defendant to assume that the important thing was the *service* of a copy of the answer on counsel for the plaintiff within the extended time so that it would advise him of the defenses proposed to be asserted, then the failure of counsel for the defendant to read the extension order carefully to see to it that a paper *served* in Savannah was *filed* on the same day in Jacksonville certainly constituted "excusable neglect." Such "neglect" permits a motion after the expiration of the time. That is the equivalent of what the Court

---

6. This is another instance in which in a doubtful and borderline situation a trial Court can profitably employ the flexible machinery of a general charge with spe-

cial interrogatories under F.R.Civ.P. 49 (a). See Fall v. Esso Standard Oil Co., 5 Cir., 1961, 297 F.2d 411, 417, note 7 and cases therein cited.

did in declining this legalistic and highly technical request for a default judgment for an error of such a slight consequence.

Reversed and remanded.