Toni DEAL, Plaintiff-Appellant,

v.

A. P. BELL FISH CO. and Beverly J. Estes, Defendants-Appellees.

No. 81–3012.

United States Court of Appeals, Fifth Circuit.

April 29, 1982.

Rehearing Denied July 27, 1982.

---

George & George, Vincent J. DeSalvo, Baton Rouge, La., Richard S. Paden, Mountain Home, Ark., for plaintiff-appellant.

Lawrence B. Shallcross, Jr., Baton Rouge, La., for A. P. Bell Fish Co.

Dennis Whalen, Baton Rouge, La., for Estes.

Before GARZA and RANDALL, Circuit Judges *:

GARZA, Circuit Judge:

This cause arises from the disappearance of seaman Richard Steven Deal from the F/V MISS IRENE on August 25, 1978.[1] At the time of his disappearance, Deal was employed as a deckhand on this vessel, a job which he had secured four days earlier when the vessel was docked in Morgan City, Louisiana. One day later, the MISS IRENE set out in Gulf waters to fish for red snapper and grouper. The ship carried three individuals for this voyage: Deal, the captain, Joseph Willard Creamer, and the cook, Willie Lee Roberts.

On a fishing voyage such as this, one of the most important duties of a crewman is standing wheelhouse watches. This involves sitting in the pilothouse of the vessel and watching the gauges and automatic

---

* Due to his death on December 22, 1981, Judge Ainsworth did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. 46(d).

1. Since Deal's body was never recovered, the question of whether his death is recognized arises. The Louisiana Code provides a five-year period after which an individual is presumed dead for inheritance purposes. La.Civ. Code Ann., art. 57 (West 1952). Another code section provides that this period be shortened when "there are strong presumptions that the person absent has perished." La.Civ.Code Ann., art. 60 (West 1952). In this case, the evidence clearly indicates that Deal perished. The vessel from which he disappeared was sixty miles offshore, and he was not wearing a life preserver at the time. Moreover, a thorough Coast Guard search for his body proved unavailing. Under these facts, we expressly hold that which the court below implicitly found: Richard Steven Deal is presumed dead as a matter of law.

2. The owner of the MISS IRENE was Beverly J. Estes, now deceased. Mr. Estes chartered the vessel to the A. P. Bell Fish Company. Since a valid bareboat charter confers on the charterer

pilot to ensure that the ship stays on course and no mechanical problems arise. In the words of the captain, "[h]e was supposed to sit on a bench, you know, up against the wall. He is supposed to watch the compass to make sure we're on the correct course and watch the temperature gauge and oil gauge and what not." Record on Appeal, vol. 3, at 107. On the morning of his disappearance, Deal was told to stand a wheelhouse watch while the other two members of the crew took a short nap. He was asked to wake the captain and cook in one hour.

Approximately one and one-half hours later, the cook woke up and went on deck to speak with Deal. When he could not find him, he immediately informed the captain. The two quickly made a thorough search of the vessel and discovered no sign of the deckhand. They then contacted the Coast Guard and reported the missing man. A search ensued but was called off at dark since no trace of the missing man had been found. At the time that the disappearance was discovered, the MISS IRENE was located in the waters of the Gulf of Mexico, approximately sixty miles from the coast of Louisiana.

A short time after the disappearance, Deal's wife brought this action for herself and her minor child. Her complaint sought damages for Deal's wrongful death under the Jones Act and under General Maritime Law for unseaworthiness. The district court granted a directed verdict dismissing the Jones Act claim on the ground that the captain of the vessel, rather than the party sued, was Deal's employer. The issue of unseaworthiness was submitted to a jury which returned a verdict in favor of both defendants, finding the vessel seaworthy. It is from this judgment that plaintiff appeals.

The basis for the directed verdict on the Jones Act claim was the court's conclusion that Captain Creamer was a bareboat charterer of the vessel from which Deal disappeared and therefore he, not the A. P. Bell Fish Company [hereinafter Bell] was Deal's employer.[2] Plaintiff urges this Court to find error in the holding that the relationship between the captain and the fish company amounted to a bareboat charter.

We begin our consideration of this portion of the case with an examination of the elements which are sufficient to permit a shipowner to insulate himself from the serious obligations imposed by the Jones Act. The bareboat or demise charter, has been characterized as follows: "The demise charter is . . . not a documentary device for the *conduct* of the business of shipping; it is rather an instrument for vesting in one person most of the incidents of ownership in a capital asset of that business—the ship— while another retains the general ownership and the right of reversion." G. Gilmore and C. Black, The Law of Admiralty 239 (2d ed. 1975). The Supreme Court test for determining the existence of a bareboat charter was articulated in *Guzman v. Pichirilo*, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962):

> To create a demise the owner of the vessel must completely and exclusively relinquish "possession, command, and navigation" thereof to the demisee . . . it is therefore tantamount to, though just short of, an outright transfer of ownership . . . .

*Id.* at 699–700, 82 S.Ct. at 1096–1097.

In *Guzman*, the Court placed the burden of proving a bareboat charter solidly on the owner of the vessel. Recognizing

---

the status of owner *pro hac vice*, we refer to the fish company as the "owner" in our discussion of the Jones Act claim. Furthermore, this simplifies our discussion of the crucial feature of this case, the existence of a second bareboat charter.

Mr. Estes must be included, however, in our discussion of the unseaworthiness claim. Although the question of an owner's liability for unseaworthy conditions arising after the commencement of a charter is unsettled in this Cir-

cuit, cf. *Baker v. Raymond Inter.*, 656 F.2d 173, 184 (5th Cir. 1981) with *Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89, 96 (5th Cir.), modified per curiam, 520 F.2d 1104 (1975), it is certain that an owner remains liable for an unseaworthy condition which pre-exists the charter. However, in this case, the parties stipulated that any unseaworthiness was not the result of the owner's privity or knowledge, and that his liability would be limited to one-half of the vessel's value.

that the existence of a bareboat charter often operates to relieve from liability the only party who can shoulder its burden, the Court stated:

> The owner who attempts to escape his normal liability for the unseaworthiness of his vessel on the ground that he has temporarily been relieved of this obligation has the burden of establishing the facts which give rise to such relief.... This burden is heavy, for courts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship.

*Id.* at 700, 82 S.Ct. at 1097.

■ *Guzman* and subsequent Fifth Circuit cases determining the existence of bareboat charters have closely examined the facts presented in order to ascertain whether the requisite "possessory interest" existed. We turn then to an examination of the specific agreement between Captain Creamer and Bell. It is clear that Captain Creamer had the liberty to hire all crewmembers and navigate the ship wherever he wished. These factors, however, are of no significance in determining whether the burden of proving the existence of a bareboat charter has been met. As this Court noted in *Stevens v. Seacoast Co.*, 414 F.2d 1032 (5th Cir. 1969), it is longstanding procedure in this business for the captain to hire and fire crewmembers and "[j]ust how a remote owner could navigate a vessel from shore is not revealed." *Id.* at 1035.

The agreement between Creamer and Bell provided that the captain would give the fish company either one-third of each catch or the cash value thereof. Defendants urge us to hold that this added factor renders the agreement a bareboat charter. While this provision of the agreement initially appears to express independence on the part of the captain which is consistent with the characterization of the agreement as a bareboat charter, a closer look at the agreement reveals that this independence is merely illusory. The agreement was, after all, verbal and provided no set duration. In *Bishop v. United States*, 476 F.2d 977 (5th Cir. 1973), *cert. denied*, 414 U.S. 911, 94 S.Ct. 234, 38 L.Ed.2d 149 (1973), this Court made the following relevant comments about the right to terminate:

> Considering the relative economic disparity between the owner of an expensive ocean-going vessel with high costs for operation, bunkering, maintenance and insurance, and a prospective master whose only investment in the enterprise is his time and energy, this right to terminate is a powerful force. The notion that such a master really has the full command, possession and control of the ship to do as he pleases in that fishing trade is simply not realistic.

*Id.* at 979. *See also Anderson v. United States*, 450 F.2d 567 (5th Cir. 1971); *Stevens v. Seacoast Co., supra.*

Further support for a finding that this agreement was not a bareboat charter is found in the evidence that ship repairs were charged to Bell. The captain testified at trial as follows in response to questions from plaintiff's attorney:

Q. Did you conduct any repairs on the vessel before you departed for Louisiana in August of nineteen seventy-eight?

A. Yes, I did.

Q. What type of repairs were conducted?

A. Put a plywood canopy over the stern of the boat for shade purposes.

Q. Where did you get the material to do that?

A. I don't remember the name of the company, but I probably charged them to A. P. Bell.

Q. You didn't pay for those yourself?

A. No.

Record on Appeal, vol. 3, at 93.

Defendant did present evidence that the fuel, ice, and grocery costs were to be covered by the crew and captain out of their share of the earnings. This factor, standing here as the sole support for the characterization of this agreement as a bareboat charter, proves inadequate to the task. For this reason, we must reverse the district court's directed verdict on the Jones Act claim.

■ We next confront the unseaworthiness claim which the jury was allowed to consider. Any seaman has a recourse in personam against the owner of a vessel in an unseaworthy condition. *Reed v. S.S. Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963). The jury concluded that the MISS IRENE was seaworthy and denied plaintiff any recovery for this reason. Plaintiff maintains, however, that the vessel was unseaworthy as a matter of law. Despite the fact that the decedent was an inexperienced seaman, he was not instructed to wear a life preserver. The cook testified that it is inadvisable to wear a life preserver on a fishing vessel because of the possibility of getting a hook tangled in it when the seaman casts a line with a weight attached thereto. This could result in the seaman being tossed overboard.[3]

■ We do not find this rationale convincing. Even assuming arguendo that there is a possibility of injury occurring at the time fishing lines are cast into the sea, this does not relieve the owner of the duty to instruct seamen in the use of life preservers. At the time that decedent disappeared, he was not engaged in any fishing activity but was standing a wheelhouse watch. The captain admitted that it is common for a crewman to leave the wheelhouse for a short period of time.[4] It is undisputed that there was no bathroom on this vessel.[5] If the decedent had been instructed to wear a life preserver, only the most extraordinary of circumstances would have resulted in death by drowning.

The duty of the shipowner to instruct inexperienced seamen in the use of life preservers was clearly set out in *Davis v. Parkhill-Goodloe Co.*, 302 F.2d 489 (5th Cir. 1962):

> Whatever a shipowner might be permitted to do with respect to seasoned hands familiar with the peculiar hazards of the sea, it is plain that it could not absolve itself of the pervading obligation to furnish a seaworthy vessel and exercise a prudent care for seamen by leaving this important decision—to wear or not wear a life vest?—up to this inexperienced, untrained farm boy who had not yet begun to get his sea legs. This is but the application of the familiar principle of salt water, amphibious and landlocked jurisprudence that there is a duty to warn in an effective way of dangers not reasonably known, and a duty to take effective action in the light of the particular condition—here inexperience and ignorance of seagoing perils—of the particular seaman . . . .

*Id.* at 494 (citations omitted).

The failure to instruct about the use of life preservers and the failure to provide a working bathroom resulted in unseaworthiness as a matter of law.

For the reasons set out above, we reverse the district court's judgment and remand for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Record on Appeal, vol. 3, at 38.

---

3. The cook testified in response to plaintiff's attorney's questions:

Q. Did you tell him anything about wearing life preservers while he was on deck?
A. You don't supposed to wear life preservers, not on a fish boat.
Q. Why?
A. If you get a hook hung in your life preserver when you throw your weight overboard, you might go with it. All the Coast Guard requires is if you can be where you can get to them in case of an emergency.
Q. Did this vessel have any life preservers on board?
A. Sure.
Q. Where are they located?
A. Right in the wheelhouse.

4. Defendant contends that Deal's disappearance was occasioned by his disobedience of orders. He had been instructed to remain in the wheelhouse. However, both the captain and cook admitted that it was their practice to leave the wheelhouse for brief periods of time in order to attend to the call of nature. He was simply following the same procedure they used.

5. Captain Creamer testified at trial in response to the questioning of plaintiff's attorney:

Q. Captain, was there a restroom aboard the MISS IRENE?
A. No, there was not.
Record on Appeal, vol. 3, at 109.