In the Matter of the Complaint of The ADMIRAL TOWING AND BARGE CO., As Bareboat Charterer, and the Great Lakes Towing Co., As Owner of the Tug Admiral, Her Engines, Etc., For Exoneration from or Limitation of Liability, Plaintiff.

ADMIRAL TOWING, Etc. and the Great Lakes Towing Co., et al., Defendants-Third Party Plaintiffs-Appellees Cross-Appellants,

v.

SEATRAIN INTERNATIONAL, S.A., et al., Defendants-Third Party Plaintiffs-Appellants Cross-Appellees.

No. 84–4315.

United States Court of Appeals, Fifth Circuit.

Aug. 8, 1985.

Gerard T. Gelpi, Norman C. Sullivan, Jr., New Orleans, La., Hill, Betts & Nash, Mark M. Jaffe, Allan J. Graf, New York City, for appellants.

Stanley McDermott, III, New Orleans, La., Bigham, Englar, Jones & Houston, Louis G. Juliano, New York City, for Atlantic Mut. Ins.

Waesche, Sheinbaum & O'Regan, Louis P. Sheinbaum, New York City, for U.S. Fire Ins. Co.

John W. Sims, J. Barbee Winston, Bart Hall, New Orleans, La., Robert G. McCreary, Jr., Cleveland, Ohio, for appellees.

Before THORNBERRY, RUBIN, and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The intricate transactions that resulted in this litigation cannot be simply stated. A complex set of charters, subcharters, insurance provisions, insurance policies, and the eventual sinking of a tug and tow with resultant loss of both vessels and the cargo aboard the tow result in this snarl of facts and law.

A corporation bareboat chartered its tug to its corporate subsidiary, which, in turn, time chartered the tug to another corporation. The latter corporation, the time charterer of the tug, also bareboat chartered a barge, which became the tug's tow, and then chartered space aboard the barge to its corporate affiliates, which carried cargo aboard the barge. The barge was in the tow of the tug when a tow line broke, causing the stranding and eventual loss of both the tug and tow.

The bareboat charterer of the tow and its affiliated cargo carriers, along with their insurers, seek to recover their losses from both the corporate owner of the tug and its subsidiary. The district court found that the bareboat charter between the corporate owner of the tug and its subsidiary insulated the actual owner from liability on all claims. We affirm the district court's findings that the bareboat charter was valid and that the corporate owner was not independently responsible for the stranding.

A clause in the time charter of the tug obligated the "charterer" to provide for waiver of subrogation against the "owner" of the tug. Because the time charter listed the bareboat charterer of the tug as "owner," the contract protected the bareboat charterer from claims by both the time charterer and its insurers. Because the bareboat charter of the tug insulated its actual owner from all claims, we need not address the district court's alternative find-

ing that the tug time charter, read together with a written waiver of subrogation issued by the charterer's hull insurer on the barge, effectively waived subrogation against the corporate owner of the tug as well as its subsidiary-bareboat charterer.

We also affirm the district court's finding that the waiver of subrogation provision in the tug time charter bound the charterer's affiliated corporations because the charterer acted as their agent in executing the time charter party. The district court, however, held that the Protection and Indemnity (P and I) insurers of the affiliated cargo carriers, as their subrogees, could recover from the "owner" of the tug because the policies they had issued did not waive subrogation. In doing so, the court overlooked the fact that the insured affiliates could not assert such claims for they were bound by the time charter party to waive subrogation. The insurer-subrogees could not have had a better claim than the insured-subrogors. We, therefore, reverse the judgment against the tug owner on those subrogation claims.

The district court further held that the language of the tug time charter, "any claims for damages or loss of . . . the cargo . . . shall be borne by the appropriate marine underwriters insuring its said . . . cargo, without recourse against the Owner, or the tug," evidenced the parties' intent that the time charterer would procure insurance that would be primarily responsible for payment of any cargo claims and that would protect the tug and its owner from such claims. The court found that, while the charterer had failed to procure such insurance, it had procured special "Shipowners' Liability to Cargo" (SOL) policies, with waivers of subrogation against the tug owner, in an attempt to insure against its failure to protect the tug owner from cargo claims. The charterer's failure to procure the insurance required by the tug time charter, the district court concluded, entitled the tug owner to recover over from the charterer and affiliated cargo carriers any amounts the tug owner might be compelled to pay on claims brought by the cargo interests. It held that the charter-

er's SOL insurance would cover its liability on the indemnification claims, but that the tug owner could not bring a direct action against the SOL underwriters. Finding these factual conclusions supported by evidence in the record and agreeing that indemnification is the proper remedy but that a direct action is not available, we affirm these findings.

## I.

We condense the complex facts to those essential to understanding the issues. The claims arise out of the stranding of a barge, the CHRISTINA F, off San Juan, Puerto Rico while in the tow of the tug ADMIRAL. This caused the loss of the tug, the barge, and the cargo aboard the barge. The tug was owned by Great Lakes Towing Corporation. Great Lakes had chartered it, purportedly bareboat, to its wholly-owned subsidiary, Admiral Towing, under a charter that required Admiral Towing to insure the tug. Admiral Towing had time chartered the ADMIRAL to Seatrain Intermodal Services Corporation (Intermodal).

The barge, CHRISTINA F, was owned by Bulk Food Carriers, Inc., which later transferred title to Mu-Petco Shipping, Inc., neither being a party to this action. It was bareboat chartered to Intermodal, making Intermodal the time charterer of the tug and bareboat charterer of the barge. Intermodal entered into charters of space aboard the CHRISTINA F to two of its affiliated corporations, both common carriers, Seatrain International S.A. (International) and Seatrain Gitmo, Inc. (Gitmo), which transported cargo in containers. Gitmo issued bills of lading for cargo destined for United States ports and International issued bills of lading for cargo destined for other ports.

The bareboat charter of the tug from Great Lakes to Admiral Towing defines the terms "owner" (Great Lakes) and "charterer" (Admiral Towing) to include "any affiliated and/or subsidiary company listed in Part II," but lists no other affiliated com-

panies. It requires Admiral Towing to obtain insurance "to completely protect the owner from any and all liability ... arising out of the operation of the vessel under this charter." The tug time charter from Admiral Towing to Intermodal, however, identifies Admiral Towing as "owner" and Intermodal as "charterer." It requires "the Owner" to provide insurance on "the vessel" (the tug but not the tow) and in clause 15 requires the "charterer" to carry "Hull and Cargo insurance on the tow and the cargo respectively to the full extent of their respective values, [and] P & I insurance in amounts satisfactory to the Owner" of the tug. It also requires the charterer to "provide for waiver of subrogation against the Owner of the tug, it being the intent hereof that any claims for damages or loss of the tow, or the cargo thereon shall be borne by the appropriate marine underwriters insuring its said tow and cargo, without recourse against the Owner, or the tug."

Through William Bennett, an employee of its insurance broker, Intermodal obtained insurance for the barge. Bennett obtained a hull policy on the barge with an oral commitment from the underwriter to issue the policy with a waiver of subrogation, which was issued in writing only after the accident. The written policy endorsement reads: "the bareboat charterer [of the barge, i.e., Intermodal] has given a full release to the tug and, consequently, there shall be no rights of subrogation against the tug and/or its *owners*."[1] Bennett also obtained P & I insurance to cover the liability of Intermodal as bareboat charterer of the barge. Because the P & I underwriter, The Club, would not agree to waive subrogation against the tug owner as provided in the tug time charter, Bennett obtained, at additional cost, a policy called "Shipowners' Liability to Cargo" [SOL], which provides coverage for claims for loss of cargo with a waiver of subrogation against the tug ADMIRAL in accordance with the time charter of that tug.

The underwriters paid claims for the loss of the barge, the containers, the cargo, and asserted their rights as subrogees of those claims. The insured parties asserted claims for their deductible portions of the losses. Admiral Towing was not liable to either Intermodal or its hull underwriter for loss of the barge because these parties had, in the tug time charter and accompanying hull policy endorsement, waived subrogation against the tug and its "owner," Admiral Towing. Intermodal and its insurers, however, contend that Great Lakes, as the legal owner of the tug ADMIRAL, is independently liable for the damages resulting from the stranding of the barge because the bareboat charter between Great Lakes and Admiral Towing was not valid, Great Lakes knew of the tug's unseaworthiness and failed to cure it, and Great Lakes was, therefore, independently negligent.

The district court found that the vessels had been grounded as a result of the tug's negligence and unseaworthiness. It concluded, however, that the bareboat charter was valid and exonerated Great Lakes from liability for Admiral Towing's faults. It found that Great Lakes was not independently negligent and not liable for the unseaworthiness of the tug.

The district court held that, although Great Lakes and Admiral Towing were parent and subsidiary, had a close operating relationship, and Great Lakes had "considerable domination" over Admiral Towing, Great Lakes had divested itself of the "possession, command and navigation of the vessel" sufficiently to constitute Admiral Towing its bareboat charterer.[2] It found that the alleged officers and employees of Admiral Towing were indeed acting on behalf of Admiral Towing even though one officer was the president of both corporations and there was some evidence of Great Lakes' control of these persons. It concluded that the president of Great Lakes had no knowledge of the tug's unseaworth-

---

1. Emphasis added.

2. *See Guzman v. Pichirilo*, 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205, 207 (1962).

iness and that the persons responsible for the stranding were all employees of Admiral Towing, not Great Lakes.

## II.

Intermodal points out evidence that would support the conclusion that these persons were Great Lakes' employees. But this simply does not suffice. Unless we have the "definite and firm conviction" that the district court has erred, we must accept its factual conclusions.[3] The record contains ample evidence to support the trial court's findings and, as required by Federal Rule of Civil Procedure 52(a), we give "due regard ... to the opportunity of the trial court to judge of the credibility of the witnesses." As an appellate court, we sit with limited powers and defined duties. We do not retry facts although we may correct manifest error.

■ The demise or bareboat charter is, as Gilmore and Black have said, "not a documentary choice for the *conduct* of the business of shipping; it is rather an instrument for vesting in one person most of the incidents of ownership in a capital asset of that business—the ship—while another retains the general ownership and the right of reversion."[4] If a vessel is chartered bareboat, the owner may escape liability in personam for the condition or management of the vessel at least in some circumstances. The owner therefore "has the burden of establishing the facts which give rise to such relief."[5] While we closely examine the circumstances[6] to determine whether the owner has so far relinquished "possession, command, and navigation" of the vessel as to be "tantamount to, though just short of, an outright transfer of ownership,"[7] the district court's findings of fact

remain embossed by the clearly erroneous rule.

■ The district court's findings are not impugned by inconsistent evidence. There is no evidence that Admiral Towing did not have the power to hire all of the crew members or to navigate the tug wherever it wished. Great Lakes did not share in the profits of the vessel but received only the stated charter fee. It would, therefore, be pointless to pursue the analogy urged by the appellants, that of comparing the tests used to establish the liability of a general employer for acts of its employee.[8]

Michael Chicarel was the port captain for the tug. The district court found that he was an employee solely of Admiral Towing and hence that Great Lakes was neither liable for his acts nor charged with his knowledge. The district court noted that Great Lakes advanced Chicarel's salary although the court did not mention that Great Lakes filed an Internal Revenue wage statement form (W–2) stating that it was Chicarel's employer. The court did find, however, that Chicarel at the time of the casualty was attending solely to Admiral's business, and Admiral's only business was the ocean tow under way. All of Chicarel's thirty years experience was in vessel operations on salt water and he had no training for operations on the Great Lakes and performed no services for Great Lakes. He had been employed by Admiral because the president of Admiral (who was also the President of Great Lakes) wanted him to represent Admiral in its operations in the Atlantic Ocean and Gulf of Mexico. These facts scarcely mandate the conclusion that it was clear error to regard Chicarel as the sole employee of Admiral Towing.

3. *E.g., O'Toole v. New York Life Ins. Co.,* 671 F.2d 913, 914 (5th Cir.1982).

4. G. Gilmore and C. Black, The Law of Admiralty 239 (2d ed. 1975), quoted with approval in *Deal v. A.P. Bell Fish Co.,* 674 F.2d 438, 440 (5th Cir.1982).

5. *Guzman v. Pichirilo, supra* n. 2, 369 U.S. at 700, 82 S.Ct. at 1097, 8 L.Ed.2d at 208.

6. *E.g., Deal v. A.P. Bell Fish Co.,* 674 F.2d 438, 441 (5th Cir.1982).

7. *Guzman v. Pichirilo, supra* n. 2, 369 U.S. at 699–700, 82 S.Ct. at 1096, 8 L.Ed.2d at 207.

8. *See Kiff v. Travelers Insurance Company,* 402 F.2d 129 (5th Cir.1968).

For these reasons, we accept the finding that Great Lakes had relinquished control of the tug to Admiral Towing. While the validity of the bareboat charter is a question of law, on which we have carte blanche to correct error, that conclusion is based on subsidiary findings of fact that are the basic province of the district court. Accepting these fact findings, the bareboat charter from Great Lakes to Admiral Towing was valid. We also affirm the district court's findings that Admiral employees were responsible for the stranding and that Great Lakes had no knowledge of the tug's unseaworthiness and was not independently negligent.

Because the bareboat charter protects Great Lakes from all claims by all appellants, we need not review the district judge's alternative finding that the waiver of subrogation provisions in the tug time charter and accompanying hull policy endorsement, read together, protected Great Lakes, as an "owner" of the tug, from subrogation claims brought by Intermodal and its insurer.

### III.

Seatrain Gitmo and Seatrain International and their P and I insurers (all of whom we shall for convenience call the Seatrain interests, since their positions are identical) seek to recover from Great Lakes and Admiral Towing the damages they sustained as a result of the loss of the cargo and containers. Great Lakes, of course, is insulated from all liability for the reasons discussed in part II. Clause 15 of the tug time charter, as we have mentioned above, obligated the "charterer" to carry "cargo insurance … on the … cargo" and to provide for waiver of subrogation against the owner of the tug, stating that it is "the intent hereof that any claims for damages or loss of the tow, or the cargo thereon shall be borne by the appropriate marine underwriters insuring its said tow and cargo, without recourse against the Owner, or the tug." The "charterer" is defined as

only Intermodal. For this reason, the Seatrain interests assert, Intermodal's obligation to secure a waiver of subrogation did not bind Gitmo and International, their insurers did not waive subrogation against Admiral Towing or the tug, and all are, therefore, free to assert claims against Admiral Towing and the tug.

The district court found that, at the time the tug time charter was executed, the parties intended that Intermodal, which was also the bareboat charterer of the barge, would be the cargo carrier bearing liability under the Carriage of Goods by Sea Act[9] (COGSA) for loss of or damage to cargo on board the barge. In reliance on that assumption, Admiral Towing required that only Intermodal obligate itself to provide a waiver of subrogation. Without notice to Admiral Towing, and for their own business reasons, the Seatrain entities decided that Gitmo and International would become the COGSA carriers and issue the bills of lading to cargo interests. "The Seatrain entities cannot be permitted," the court concluded, "to take advantage of their unilateral action to defeat Admiral's rights [to waiver of subrogation] under the charter party."

These findings of fact as to the parties' intentions must be accepted, for they have support in the record.[10] The parties intended the cargo carrier, who would alone have COGSA liability, to assume that liability and obtain appropriate insurance and the waiver of subrogation against the tug and its owner. Once the arrangements with Gitmo and International were completed, Intermodal had no exposure to liability for the loss of cargo. We find no error in the district court's findings that Intermodal executed the tug time charter party on behalf of its affiliates, who would actually carry the cargo, and indeed acted as agent for all the Seatrain entities when time chartering the tug and bareboat chartering the barge, both of which would serve the affiliated cargo carriers. When Intermodal's affil-

**9.** 46 U.S.C. §§ 1300 *et seq.*

**10.** *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

iates became the cargo carriers, replacing Intermodal, they therefore assumed their affiliate's responsibilities under the tug time charter party, including the obligation to obtain their P and I insurers' waiver of subrogation against the tug and its owner, Admiral Towing.[11] Clause 15 states the parties' intention "that any claims for ... loss of ... cargo ... shall be borne by the appropriate marine underwriters ... without recourse against the Owner or the tug." To impose liability on the owner of the tug as a result of the unilateral space arrangements made by the charterer would defeat the intent expressed in the tug time charter.

That Gitmo and International were separate corporations engaged in common carriage by water, and that Intermodal's business was equipment and terminal operations, do not undermine the district court's findings. There is no evidence that these facts were made known to Admiral Towing when the charter was made. The district court simply held that all three of the Seatrain interests—Intermodal, Gitmo and International—were obligated to obtain waivers of subrogation.

## IV.

Admiral Towing cross appeals the allowance against it of the subrogation claims asserted by the P & I insurers of Gitmo and International for recovery of amounts paid to the cargo carriers under the policies. As the district court recognized, these P & I underwriters had refused to waive subrogation. It does not follow, however, that they should be allowed subrogation against the tug or its owner. Any claim by any insurer arose solely out of its rights as subrogee of the insured party.

Subrogation was first recognized as a right in equity to prevent the unjust enrichment of a party who owed a claim that had been satisfied by another party.[12] Later the equitable right was preserved and sometimes extended by incorporating it into the contract between the claim-debtor and the party who, although not ultimately liable for the claim, satisfied it. Whether subrogation is equitable or conventional or both, the subrogee does not obtain redress in its own right but only as successor to the rights of the subrogor.[13] Accordingly, a subrogee can obtain no greater rights than its subrogor had.[14] This principle, applied by us in *Liberty Mutual Insurance Company v. Gulf Oil Corporation*,[15] a Louisiana diversity case, is imminent in the concept of subrogation, the right to assert the claim of another. If Gitmo and International, the subrogor-insureds, were barred from asserting claims against Admiral Towing, their insurer-subrogees could not surmount that barrier. The P and I underwriters therefore could not assert subrogation claims against Admiral Towing or the tug.

None of the appellants, then, may assert claims against Admiral Towing or the tug. We therefore pretermit discussing whether Admiral Towing might have obtained indemnification from the Seatrain entities for any amounts paid to the P and I underwriters of Gitmo and International had they been entitled to subrogation.

## V.

The tug time charter, as recited above, required the "charterer" (Intermodal, and, through the agency principles discussed in Part III, International and Gitmo)

11. *E.g.,* Restatement (Second) of Agency § 186 (1958), and authorities cited therein.

12. G. Palmer, The Law of Restitution § 1.5(b) at 21 (1978), and authorities cited therein.

13. J. Appleman, *Insurance Law and Practice* § 4102 at 367 (1972), and authorities cited therein; Couch on Insurance § 61:36 at 118–119 (2d ed. 1983).

14. *Appleman, id.,* § 4102 at 368; *Standard Marine Ins. Co. v. Scottish Metropolitan Assur. Co.,* 283 U.S. 284, 51 S.Ct. 371, 75 L.Ed. 1037 (1931); *Phoenix Insurance Co. v. Erie and Western Trans. Co.,* 117 U.S. 312, 6 S.Ct. 750, 29 L.Ed. 873 (1886); *Liberty Mut. Ins. Co. v. Gulf Oil Corp.,* 559 F.Supp. 777, 782 (E.D.La.1983), *aff'd,* 725 F.2d 293 (5th Cir.1984).

15. *Id.*

to carry cargo insurance to the full extent of its value, P and I insurance "in amounts satisfactory to the Owner" of the tug, and to "provide for waiver of subrogation against the Owner of the tug, it being the intent hereof that any claims for damages or loss of the tow, or the cargo thereon shall be borne by the appropriate marine underwriters insuring its said tow and cargo, without recourse against the Owner, or the tug." The district court found, and we agree, that this language required the Seatrain entities "to procure an insurance policy which would be primarily responsible for payment of claims asserted by Cargo for which the carrier was liable without recourse against the tug." The contract, according to the court, amounted to an agreement by the charterer to obtain insurance to protect the tug and its owner from liability to cargo. This finding as to the parties' intent, supported by the language of the contract and testimony in the record, is not to be disturbed on appeal.[16]

The Seatrain entities did not obtain property insurance on the cargo, as warranted, although they argue that it was not feasible for them to insure property they did not own. Further, Intermodal was unable to obtain P and I insurance with a waiver of subrogation against the tug or its owner. The district court therefore properly allowed Admiral Towing indemnification against the Seatrain entities, in the event of future claims by cargo, for their failure to hold Admiral Towing harmless from liability to cargo.

■ The district court found that Intermodal had procured SOL policies to cover its failure to procure the insurance required by the tug time charter. Gitmo and International were later added as additional insureds under the first SOL policy. The policies waived subrogation against the tug and its owner, as provided in the time charter of the Tug Admiral, and were issued

"to cover the contractual legal liability of the Assured for loss and/or damage ... to cargo, ... not recoverable from cargo interests, assumed by Charterers under the Charter Party between vessel Owners and the Assured's hereunder." The district court's finding, which we affirm because supported by the record, was that the SOL policies were intended to insure Intermodal against liability for breach of its contractual obligation to hold the tug and its owner harmless from cargo claims. The court therefore properly held that the SOL policies would cover the Seatrain entities' liability on any indemnification claims asserted by Admiral Towing.

■ The district court held, however, that Admiral Towing could not proceed directly against the SOL underwriters under the Puerto Rican direct action statute. Because Admiral Towing's indemnification claims arise from the Seatrain entities' breach of contractual obligations, and not from tortious activity, we agree that the direct action was not available.[17]

## VI.

For the reasons given, we AFFIRM the judgment of the district court insofar as it denies appellants' claims against Great Lakes, Admiral Towing, and the tug ADMIRAL. We REVERSE the judgment allowing the P and I underwriters of Gitmo and International to assert subrogation claims against the tug and Admiral Towing. We AFFIRM the judgment allowing Admiral Towing indemnification against the Seatrain entities for cargo claims and holding that the SOL policies insure the Seatrain entities against this liability. We AFFIRM the judgment denying Admiral Towing a direct action against the SOL underwriters.

All costs are to be assessed against the appellants and the cross appellees, and to

---

**16.** *Supra* n. 10.

**17.** *Cf., Deutsche-Schiffahrtsbank A.G. v. A. Bilbrough and Co.,* 563 F.Supp. 1307, 1309 (E.D.La. 1983); *Taylor v. Fishing Tools, Inc.,* 274 F.Supp. 666, 673 (E.D.La.1967); *Pennsylvania Fire Ins.* *Co. v. Underwriters at Lloyd's,* 140 So.2d 212, 215 (La.App. 4th Cir.1962); *Ramos v. Continental Insurance Company,* 493 F.2d 329 (1st Cir. 1974).

be recovered in full by the Great Lakes and Admiral interests.